# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF VERMONT

| | |
|---|---|
| ABBVIE INC.; ALLERGAN, INC.; DURATA THERAPEUTICS, INC.; ABBVIE PRODUCTS LLC; PHARMACYCLICS LLC; and ALLERGAN SALES, LLC, <br><br> *Plaintiffs*, <br><br> v. <br><br> RICK HILDEBRANT, in his official capacity as Commissioner of Health for the State of Vermont, <br><br> *Defendant*. | Case No. ___2:25-cv-898___ |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs AbbVie Inc., Allergan, Inc., Durata Therapeutics, Inc., AbbVie Products LLC, Pharmacyclics LLC, and Allergan Sales, LLC (collectively "AbbVie"), by and through their undersigned attorneys, bring this action for declaratory and injunctive relief against Vermont's Commissioner of Health, challenging the constitutionality of Vermont's Vt. Stat. Ann. tit. 18, ch. 91, subch. 6 ("H.B. 266"). In support, AbbVie alleges as follows:

### PRELIMINARY STATEMENT

1.      AbbVie brings this lawsuit to challenge the constitutionality of H.B. 266—a Vermont law that requires, among other things, AbbVie to transfer its pharmaceutical products to certain commercial pharmacies at substantially discounted prices on pain of civil penalties. In so doing, Vermont's statute violates the Supremacy Clause by, among other things, impermissibly changing the terms of and increasing the cost of participation in a federal drug-pricing regime—the federal 340B Program—and interfering with AbbVie's ability to participate in a federal pilot

program—the Health Resources and Services Administration ("HRSA")'s Rebate Model Pilot Program ("Rebate Program"). In addition, H.B. 266 effects an unconstitutional taking in violation of the Takings Clause of the Fifth Amendment. It is also unconstitutionally vague.

2.    H.B. 266 arises out of a long-running dispute about the requirements that the federal 340B Program places upon drug manufacturers. In short, the federal 340B statute, 42 U.S.C. § 256b, establishes a comprehensive program that requires pharmaceutical manufacturers to offer their drugs at statutorily set and significantly reduced prices to a list of fifteen specifically enumerated types of healthcare providers known as "covered entities." Making these offers of drugs at the significantly reduced prices to these providers is required for manufacturers who want to participate in federal Medicaid and Medicare programs. *See* 42 U.S.C. §§ 256b, 1396r-8(a)(1), (5).

3.    Under the 340B statute, manufacturers are required only to "offer" their drugs to covered entities at the 340B price—not "sell" them unconditionally. 42 U.S.C. § 256b(a)(1). That is, the 340B statute requires only that manufacturers make an offer at a particular price to a particular set of covered entities. At the same time, it preserves the liberty of manufacturers to insist upon other non-price terms. Commercial pharmacies, like Walgreens and CVS, are not among the 340B statute's list of entities entitled to an "offer" of the 340B price.

4.    The federal statute grants the Secretary of the U.S. Department of Health and Human Services ("HHS") exclusive authority to enforce its provisions. *See* 42 U.S.C. § 256b(d). The statute leaves no role for states or other third parties to change the requirements of the federal 340B Program or the conditions it imposes on manufacturers in return for participating in Medicaid and Medicare. Nor do states or other third parties have any authority to enforce the federal statute's requirements. The Supreme Court has confirmed as much, explaining that third-party enforcement

"would undermine the agency's efforts to administer" the 340B Program and other related federal programs "harmoniously and uniformly." *Astra USA, Inc. v. Santa Clara Cnty.*, 563 U.S. 110, 119-20 (2011).

5. Further, because forcing manufacturers to transfer their drugs at discounted prices to covered entities would raise serious constitutional concerns, Congress did not mandate participation in the 340B Program outright and instead tied it to an ostensibly voluntary choice: participation in Medicaid and Medicare. And to further incentivize manufacturer participation in the 340B Program—*i.e.*, to prevent the cost of participation from becoming too high—Congress carefully limited the Program and adopted certain safeguards to ensure that manufacturers' discounted drugs would be used to help needy patients rather than become a buy-low, sell-high scheme for commercial entities. For example, in a statutory provision designed to prevent "diversion," Congress prohibited covered entities from transferring manufacturers' reduced-price drugs to anyone other than the entity's own patients. *See* 42 U.S.C. § 256b(a)(5)(B). In effect, that provision prohibits other commercial entities from either participating in the 340B Program or profiting from the sale of manufacturers' drugs at the 340B-discounted price.

6. Nevertheless, over the last decade, covered entities have entered contractual arrangements with commercial pharmacies (called "contract pharmacies") that allow those pharmacies to earn windfall profits from the sale of manufacturers' drugs. Instead of serving the covered entities' uninsured and low-income patients, the for-profit contract pharmacies acquire manufacturers' drugs at the federally discounted price, sell them to patients (including indigent patients) at full price, and pocket the difference. Contract pharmacies accomplish this arbitrage through a complicated accounting system known as the "replenishment model," described in more detail below. The bottom-line result is that for-profit commercial pharmacies and the covered

entities they contract with are able to pocket billions of dollars every year, splitting the profits at the expense of both manufacturers and the needy patients who are supposed to be served by the federal 340B Program.

7.      Neither contract pharmacies nor the replenishment model are features of the ordinary commercial drug-distribution system in the United States.  They solely exist in the 340B context, where they are unauthorized by statute.  AbbVie is involved in no other commercial arrangement using contract pharmacies or the replenishment model.  Contract pharmacies and the replenishment model are creatures only of the federal 340B drug discount arbitrage regime.

8.      In response to these abuses, manufacturers (including AbbVie) have exercised their right to impose reasonable conditions on their 340B offers by implementing policies that decline to transfer 340B drugs to an unlimited number of contract pharmacies.  For example, subject to further detail explained below, AbbVie will only transfer 340B drugs to one contract pharmacy affiliate of a covered entity, provided it is within 40 miles of said covered entity.  That is in stark contrast to the arrangement that covered entities, contract pharmacies, and now, the State of Vermont, would like, in which AbbVie would be required to transfer unlimited 340B drugs to dozens or hundreds of contract pharmacies per covered entity.

9.      It is beyond dispute that AbbVie's policy complies with—and indeed, is enabled by—federal law because manufacturers are bound only to "offer" their drugs at discounted prices to covered entities.  The 340B statute does not compel sales or unconditional offers, nor does it require manufacturers to transfer 340B-discounted drugs wherever and to whomever a covered entity demands.  And it certainly does not require manufacturers to subsidize commercial pharmacy profits under the guise of 340B compliance.

10. Manufacturers' decisions to address these abuses resulted in litigation between manufacturers and HHS, and the U.S. Courts of Appeals for the Third and D.C. Circuits confirmed that the manufacturers' policies are lawful under the federal 340B Program. *See Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452 (D.C. Cir. 2024); *Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696 (3d Cir. 2023). Again, Congress required manufacturers to ***offer*** their covered outpatient drugs at discounted prices in return for participating in Medicaid and Medicare, and the 340B statute preserved manufacturers' liberty to include reasonable, bona fide terms in those offers. *See Novartis*, 102 F.4th at 460-64; *Sanofi*, 58 F.4th at 703-06. Congress did not require manufacturers to provide their drugs to third-party commercial pharmacies or otherwise support arbitrage of their charitable discounts.

11. Numerous states, including Vermont, participated in the Third Circuit and D.C. Circuit cases as *amici curiae*, on the losing side. After that loss, many states turned to their own legislatures to propose and implement legislation to reach the 340B balance they wish Congress had struck by imposing requirements under the federal 340B statute that Congress chose not to impose. Vermont's H.B. 266 is an example of one such piece of legislation.

12. In particular, H.B. 266 not only eliminates manufacturers' federally preserved ability to impose reasonable conditions on 340B offers—it imposes new conditions on Medicare and Medicaid participation that Congress never authorized. *See Novartis*, 102 F.4th at 460 ("[W]e think that this silence ***preserves***—rather than abrogates—the ability of sellers to impose at least some delivery conditions." (emphasis added)). Among other things, H.B. 266 prohibits manufacturers from limiting the "acquisition" of 340B-discounted drugs by for-profit pharmacies contracted with covered entities. Vt. Stat. Ann. tit. 18, § 4682(a). Vermont's law effectively transfers to covered entities and commercial pharmacies unfettered authority to demand

manufacturers' property at significantly reduced prices for the benefit of private parties. Federal courts have recognized the blatant unconstitutionality of such laws and enjoined their enforcement. *See AbbVie Inc. v. Drummond*, -- F. Supp. 3d --, 2025 WL 3048929 (W.D. Okla. Oct. 31, 2025); *PhRMA v. Morrisey*, 760 F. Supp. 3d 439 (S.D. W. Va. 2024); *see also AbbVie Inc. v. Brown*, No. 2:25-cv-00271, ECF 95 (D. Utah Nov. 19, 2025) (concluding that AbbVie plausibly stated preemption and takings claims).

13.    This state-imposed harm—compelling manufacturers to transfer their drugs at discounted prices on terms not required by federal law and to which AbbVie would not agree—violates the United States Constitution. H.B. 266 should be enjoined for the following reasons.

14.    ***First***, H.B. 266 is preempted by federal law—namely the 340B Program and HRSA's Rebate Program—under the Supremacy Clause. The doctrine of federal preemption requires that "any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield." *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 108 (1992). Under this standard, H.B. 266 must yield. Vermont's law targets the federal 340B Program and changes its requirements by imposing onerous state-law obligations only on manufacturers who participate in the federal program. *See* Vt. Stat. Ann. tit. 18, § 4682. Vermont's law also blocks manufacturers from requesting claims data for contract pharmacy dispenses. *See id.* § 4682(b). This restriction impairs a liberty that the 340B statute grants, prevents AbbVie from accessing the federal 340B administrative dispute resolution system ("ADR"), and interferes with AbbVie's participation in HRSA's Rebate Program—a program that explicitly authorizes manufacturers to collect claims data from covered entities to obtain a 340B rebate. *See id.* H.B. 266 further thwarts AbbVie's ability to partake in the Rebate Program by prohibiting manufacturers from making 340B pricing available through an after-the-fact rebate

rather than an upfront discount. *See id.* § 4682(d). Finally, H.B. 266 creates a state enforcement regime that conflicts with the federal government's exclusive authority to enforce the 340B statute.

15. **Second**, H.B. 266 is an impermissible taking under the Fifth Amendment. Neither the federal government nor the States have any authority to force A-to-B transfers of private property for the benefit of private parties. *See Kelo v. City of New London*, 545 U.S. 469, 477 (2005). H.B. 266 does just that. It requires drug manufacturers like AbbVie to transfer their property at steeply discounted prices to other private entities if those entities have third-party contracts that purport to allow them to access AbbVie's drugs at those discounted prices. And H.B. 266's text makes clear that it seeks to regulate "acquisition" of said drugs at the discounted 340B price. *See* Vt. Stat. Ann. tit. 18, § 4682(a). Vermont has no authority to take AbbVie's private property for private use. By expanding the circumstances under which drug manufacturers must provide 340B-priced drugs to contract pharmacies, the statute unlawfully appropriates private property for the private benefit of commercial pharmacies and does so without serving any valid public purpose. *See Horne v. Dep't of Agric.*, 576 U.S. 350, 370 (2015) (holding government's confiscation of portion of farmers' raisin crop for charitable or other purpose without just compensation was a *per se* taking). And even if the Vermont law did constitute a public use (it does not), AbbVie is still entitled to injunctive relief as Vermont provides no just compensation and AbbVie possesses no means to compel just compensation.

16. **Third**, H.B. 266 violates AbbVie's due process rights because it is impermissibly vague. *See F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) ("A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required."). The statute contains a broad, open-ended, and ambiguous provision that fails to put AbbVie on notice of what is prohibited, and that invites

arbitrary enforcement. For example, H.B. 266 bars manufacturers from "interfer[ing] with, directly or indirectly, the acquisition of a 340B drug by or delivery of a 340B drug to a 340B contract pharmacy on behalf of a 340B covered entity …." Vt. Stat. Ann. tit. 18, § 4682(a). The law provides no elaboration or guidance as to what constitutes prohibited interference, though. Worse, the law defines "340B covered entity" to include contract pharmacies—so the law even prohibits AbbVie from "interfer[ing]" with pharmacies contracted with other contract pharmacies, whatever that means. *See id.* § 4681(2).

17.    AbbVie seeks a declaration that H.B. 266 is unconstitutional because it is preempted by federal law, constitutes an unconstitutional taking, and is void for vagueness. AbbVie further seeks the preliminary and permanent enjoining of H.B. 266's enforcement against AbbVie.

## PARTIES TO THE ACTION

18.    AbbVie, Inc., a Delaware Corporation, is a global research-based biopharmaceutical company dedicated to addressing some of the world's most complex and serious diseases, and advancing medical science in areas such as immunology, oncology, and neuroscience. Since 2012, AbbVie, Inc. has participated in the federal 340B drug discount program, helping uninsured and vulnerable patients obtain access to the medications they need. AbbVie's headquarters are located in North Chicago, Illinois. AbbVie, Inc. is a signatory to 340B Pharmaceutical Pricing Agreements, and/or is successor-in-interest to executed 340B Pharmaceutical Pricing Agreements, with HHS's HRSA.[1]

---

[1]    On February 11, 2025, President Trump issued Executive Order 14210, titled "Implementing the President's 'Department of Government Efficiency' Workforce Optimization Initiative." *See* 90 Fed. Reg. 9,669 (Feb. 11, 2025). On March 27, 2025, HHS announced it intended to restructure, including by creating an Administration for a Healthy America (or "AHA") which will have authority over, among other sub-agencies, HRSA. *See* Dep't of Health & Human Servs., *HHS Announces Transformation to Make America Healthy Again* (Mar. 27, 2025), https://www.hhs.gov/press-room/hhs-restructuring-doge.html.

19.    Allergan, Inc., a Delaware Corporation, is a signatory to 340B Pharmaceutical Pricing Agreements, and/or is successor-in-interest to executed 340B Pharmaceutical Pricing Agreements, with HRSA.

20.    Durata Therapeutics, Inc., a Delaware Corporation, is a signatory to 340B Pharmaceutical Pricing Agreements, and/or is successor-in-interest to executed 340B Pharmaceutical Pricing Agreements, with HRSA.

21.    AbbVie Products LLC, a Georgia Limited Liability Company, is a signatory to 340B Pharmaceutical Pricing Agreements, and/or is successor-in-interest to executed 340B Pharmaceutical Pricing Agreements, with HRSA.

22.    Pharmacyclics LLC, a Delaware Limited Liability Company, is a signatory to 340B Pharmaceutical Pricing Agreements, and/or is successor-in-interest to executed 340B Pharmaceutical Pricing Agreements, with HRSA.

23.    Allergan Sales, LLC, a Delaware Limited Liability Company, is a signatory to 340B Pharmaceutical Pricing Agreements, and/or is successor-in-interest to executed 340B Pharmaceutical Pricing Agreements, with HRSA.

24.    Defendant Rick Hildebrant is the Commissioner of Health for the State of Vermont. The Commissioner is responsible for overseeing H.B. 266 and for reporting any violation of H.B. 266 for prosecution.  *See* Vt. Stat. Ann. Tit. 18, §§ 7-8, 4684.  This suit is brought against the Commissioner solely in his official capacity.

## JURISDICTION AND VENUE

25.    AbbVie's causes of action arise under 28 U.S.C. § 1331, 42 U.S.C. § 1983, and the United States Constitution.

26.    The Court has subject matter jurisdiction under 28 U.S.C. § 1331, 28 U.S.C. § 1332, and 28 U.S.C. § 1343(a)(3).

27.     The Court has authority to grant injunctive and declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, and the Court's inherent equitable powers, including the power to enjoin the actions of state officials if contrary to the United States Constitution or federal law.  *See Ex parte Young*, 209 U.S. 123, 159-60 (1908).

28.     Venue is proper in this District under 28 U.S.C. § 1391(b) because this action challenges a Vermont law that is applicable to AbbVie's sale and distribution of drugs within this District.  AbbVie sells and distributes drugs to multiple 340B covered entities within this District, and these entities purport to maintain contract pharmacy arrangements.  Venue is also proper because Defendant maintains an office within this District through which Defendant would enforce the challenged law.

## GENERAL ALLEGATIONS

### A.     The 340B Drug Pricing Program

29.     This case concerns Section 340B of the federal Public Health Service Act, which created the federal "340B Program" as part of the authority granted in the Veterans Health Care Act of 1992.  *See* 42 U.S.C. § 256b; *see also* Pub. L. No. 102-585, § 602(a), 106 Stat. 4943, 4967 (1992).

30.     The purpose of the federal 340B Program is to "reduce pharmaceutical costs for safety-net medical providers and the indigent populations they serve" by creating "a low-cost source of pharmaceutical medication for the indigent patients themselves."  Connor J. Baer, *Drugs for the Indigent: A Proposal to Revise the 340B Drug Pricing Program*, 57 Wm. & Mary L. Rev. 637, 638 (2015) (footnote omitted).

31.     Before Congress created the 340B Program, individual manufacturers voluntarily provided their drugs at reduced prices to institutions that served needy and vulnerable patients.  In 1990, Congress passed a statute called the Medicaid Rebate Act, which had the unintended

consequence of creating disincentives for manufacturers to continue providing those voluntary discounts. H.R. Rep. No. 102-384, pt. 2, at 9-10 (1992). Through the Veterans Health Care Act, Congress remedied that unintended disincentive and established the federal 340B Program, turning the manufacturers' previous voluntary support into a federal mandate.

32.    The 340B statute requires any manufacturer participating in the federal Medicaid Drug Rebate Program to "offer" its covered outpatient drugs "for purchase" at deeply discounted prices to eligible "covered entities"—disproportionate share hospitals and other service providers that are expected to serve predominantly low-income and vulnerable patients. 42 U.S.C. § 256b(a)(1).

33.    The statute expressly limits participation in the 340B Program to "covered entities." *See id.* § 256b(a)(4). The statute defines "covered entities" to include only organizations and service providers that predominantly serve low-income patients. The definition includes, for example, federally qualified health centers, children's hospitals, qualifying rural hospitals, and clinics that serve vulnerable patients. *Id*. For-profit commercial pharmacies are not included in the statutory list of "covered entities." *Id*. Nor does the 340B statute include any provision authorizing covered entities to purchase manufacturers' drugs and dispense them through commercial pharmacies. *See AstraZeneca Pharms. LP v. Becerra*, 543 F. Supp. 3d 47, 60 (D. Del. 2021) ("It is hard to believe that Congress enumerated 15 types of covered entities with a high degree of precision and intended to include contract pharmacies as a 16th option by implication."), *aff'd sub nom. Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696, 703 (3d Cir. 2023).

34.    The discounted 340B price for each of the manufacturers' drugs is calculated by subtracting the drug's Medicaid unit rebate amount from its Average Manufacturer Price, as determined under the federal Medicaid Drug Rebate Program, codified at Section 1927 of the

Social Security Act. 42 U.S.C. §§ 256b(a)(1)-(2) & (b). The resulting prices, called the 340B "ceiling prices," are significantly lower than the prices at which manufacturers sell their products to other purchasers. For the vast majority of innovator drugs, the mandatory discounts range from at least 23.1% to more than 99.9% of the average price in the market. *See* 42 U.S.C. §§ 1396r-8(c), 256b(a)(1). Inclusive of penny-priced drugs, the average mandated discount across AbbVie's pharmaceutical portfolio is over 60% of the pharmaceutical's commercial price. These steep discounts result in many mandatory 340B ceiling prices that are as little as one penny per unit of drug.

35.     To indicate their agreement to participate in the federal 340B Program and comply with its requirements, manufacturers sign a form contract with HHS called a Pharmaceutical Pricing Agreement ("PPA").

36.     The PPA imposes no obligation on participating manufacturers to make unconditional sales to covered entities. Additionally, the PPA neither requires manufacturers to sell discounted drugs to contract pharmacies nor to facilitate the transfer of their discounted drugs to contract pharmacies. Nor does it grant covered entities any right to obtain unfettered access to manufacturers' drugs at discounted prices through contract pharmacies.

37.     Both the PPA and the federal 340B statute are structured to prevent commercial parties from participating in the federal 340B Program or from profiting off the sale of manufacturers' drugs at discounted prices. Over the past decade, however, that is exactly what has happened as a result of covered entities entering into contractual relationships with commercial pharmacies. Under these arrangements, instead of using manufacturers' deeply discounted drugs to treat indigent and uninsured patients who visit and receive healthcare services from covered entities, commercial contract pharmacies sell manufacturers' drugs at regular prices to pharmacy

customers and then demand that their stocks be replenished with drugs purchased by covered entities through the federal 340B Program at discounted prices, pocketing the difference (the "spread") for their own financial benefit.

38.    In recent years, commercial contract pharmacies have earned over ***$3.3 billion*** annually in "spread." *See* Eric Percher et al., Nephron Rsch. LLC, *The 340B Program Reaches a Tipping Point: Sizing Profit Flows and Potential Disruption*, at 3, 30-31 (2020) (concluding that $3.348 billion in 340B discounts were retained as profit by contract pharmacies in 2020 alone).

39.    These abuses of the federal 340B Program violate the letter and spirit of the federal 340B statute.  Congress designed the 340B statute with the intent that there would be a close nexus between the federal drug pricing program and its only valid public purpose—helping low-income and uninsured patients obtain access to medications at discounted prices.  Consistent with that intent, the statute prevents covered entities from using manufacturers' drugs to generate commercial profits or letting the drugs be transferred or sold to benefit entities outside the Program.

40.    The federal statute expressly forbids "diversion" by prohibiting covered entities from selling or otherwise transferring any manufacturer's discounted drugs "to a person who is not a patient of the entity."  42 U.S.C. § 256b(a)(5)(B) ("With respect to any covered outpatient drug that is subject to an agreement under this subsection, a covered entity shall not resell or otherwise transfer the drug to a person who is not a patient of the entity.").

41.    The statute also prohibits covered entities from receiving or causing "duplicate discounts or rebates."  They may not obtain a 340B discount and cause a Medicaid rebate to be paid by the manufacturer for the same unit of drug.  *Id*. § 256b(a)(5)(A).

42.    The 340B statute imposes an affirmative duty on the Secretary of HHS—through authority delegated to HRSA—to protect the Program's integrity by "provid[ing] for

improvements in compliance by covered entities … in order to prevent diversion" and violations of the statute's duplicate discount prohibition.  *Id.* § 256b(d)(2)(A).

43.    The statute provides mechanisms for resolving administrative disputes between manufacturers and covered entities through audits and a federal Administrative Dispute Resolution ("ADR") process.  *See id.* § 256b(d)(l)(B)(v), (d)(3).  Notably, HRSA recently issued a final rule setting forth additional details of the congressionally prescribed 340B ADR process.  *See* 89 Fed. Reg. 28,643 (April 19, 2024).  The final rule established a comprehensive scheme to resolve disputes between manufacturers and covered entities arising under the 340B statute.  Under the rule, "340B ADR Panels" constituted of 340B "subject matter experts" are tasked with resolving not only disputes about drug prices but also "claims that a manufacturer has limited the covered entity's ability to purchase covered outpatient drugs at or below the 340B ceiling price"—the exact issue H.B. 266 seeks to address.  *Id.* at 28,644, 28,649; *see also* 42 C.F.R. § 10.21(a).

44.    The statute entrusts enforcement of the 340B statute exclusively to the Secretary of HHS and details what penalties may apply.  *See* 42 U.S.C. § 256b(a)(5)(C)-(D), (d)(l)(B)(v), (d)(3).  As the Supreme Court reasoned in *Astra*, Congress made HHS administrator of both the Medicaid Drug Rebate Program and the 340B Program, and private enforcement by covered entities "would undermine [HHS's] efforts to administer both Medicaid and § 340B harmoniously and on a uniform, nationwide basis."  *Astra*, 563 U.S. at 119-20.

45.    Failure to comply with the statutory requirements under the 340B Program may result in termination of the PPA (and the manufacturer's ability to participate in Medicaid), federal enforcement actions, and potentially the imposition of large civil penalties.  *See* 42 U.S.C. §§ 256b(a)(5)(D), (d)(1)(B)(vi), (d)(2)(B)(v), (d)(3)(A).

**B.      The Growth in Contract Pharmacy Arrangements**

46.     In 1996, HRSA issued non-binding guidance stating that the agency would not prevent covered entities that lacked an in-house pharmacy from entering into a contractual relationship with a single outside pharmacy to dispense covered outpatient drugs to the covered entity's patients.  61 Fed. Reg. 43,549 (Aug. 23, 1996).  The guidance made clear that it "create[d] no new law and create[d] no new rights or duties."  *Id.* at 43,550.

47.     Guidance documents, such as the 1996 guidelines, are by definition general statements of policy that are non-binding, non-enforceable, and do not create any legal rights or obligations.  They are intended instead to inform the public as to how HRSA intends to exercise its enforcement discretion.

48.     In 2010, HRSA issued new non-binding guidance that radically changed how covered entities operated under the 340B Program.  The guidance stated, for the first time, that the agency recommended manufacturers allow covered entities to enter into contractual relationships with an ***unlimited*** number of "contract pharmacies," even if the covered entity had an in-house pharmacy of its own.  75 Fed. Reg. 10,272 (Mar. 5, 2010).

49.     Like the 1996 guidance, the 2010 guidance did not impose binding obligations on manufacturers.  Indeed, HRSA again made clear that the non-binding guidance created no new rights and imposed no new obligations.  *See id.* at 10,273 ("This guidance neither imposes additional burdens upon manufacturers, nor creates any new rights for covered entities under the law.").  In other words, while HRSA indicated that it would not interpret the 340B statute to prohibit covered entities from using multiple contract pharmacies, it did not purport to impose any obligation on manufacturers to transfer drugs to contract pharmacies or otherwise facilitate covered entities' use of contract pharmacies.

15

50.     Following issuance of the 2010 guidance, covered entities dramatically increased their use of contract pharmacies, with a recent study reporting an increase of 12,000% between 2010 and 2024. *See* Elanor Blalock, *For-Profit Pharmacy Participation in the 340B Program: 2025 Update*, BRG (Jan. 2025) ("BRG Report"), https://tinyurl.com/mrxzr87f. As of 2023, over 33,000 pharmacy locations—"more than half of the entire U.S. pharmacy industry"—acted as 340B contract pharmacies, up from fewer than 1,300 pharmacy locations in 2010. *See* U.S. Senate Comm. on Health, Educ., Labor & Pensions, 119th Cong., *Congress Must Act To Bring Needed Reforms To The 340B Drug Pricing Program* 3 (Apr. 2025) ("Cassidy Report"), https://tinyurl.com/44c6w2en. This explosion in the use of contract pharmacies has been driven by the prospect of sharing in the outsized profit margins on manufacturer-subsidized 340B-discounted drugs. For example, in 2009 sales of 340B-priced drugs totaled just $4.2 billion, but by 2023 they had increased by more than 30-fold to $124 billion. *See* Karen Mulligan, *The 340B Drug Pricing Program: Background, Ongoing Challenges and Recent Developments*, USC Schaeffer Ctr. For Health Pol'y & Econ. 5 (Oct. 2021) ("Mulligan"), https://tinyurl.com/3a5h2zex; Rory Martin & Harish Karne, *The 340B Drug Discount Program Grew to $124B in 2023*, IQVIA (2024), https://tinyurl.com/ywkdbbju.

51.     Similarly, the number of covered entities participating in the Program jumped from around 15,000 in 2010 to more than 50,000 by 2020. *See* Mulligan, *supra*, at 4; U.S. Gov't Accountability Off., *Increased Oversight Needed to Ensure Nongovernmental Hospitals Meet Eligibility Requirements*, GAO-20-108, at 23 (2019), https://www.gao.gov/assets/d20108.pdf ("Given the weaknesses in HRSA's oversight, some hospitals that do not appear to meet the statutory requirements for program eligibility are participating in the 340B Program and receiving discounted prices for drugs for which they may not be eligible.").

52.     Nor does the Program's explosive growth correlate with an increase in indigent patients, or improvements in care.  Indeed, since 2010, the percentage of uninsured patients in the United States has fallen by nearly 38%.  *See* Kenneth Finegold et al., U.S. Dep't of Health & Hum. Servs., Off. of the Assistant Sec'y for Planning & Evaluation, Trends in the U.S. Uninsured Population,  2010-2020,  Issue  Brief  No.  HP-2021-02,  at  2  (Feb.  11,  2021), https://tinyurl.com/4rf9cm8t.

53.     Contract pharmacies, which are predominantly large commercial pharmacy chains, do not operate like in-house pharmacies, do not themselves qualify as covered entities, and do not owe fiduciary duties to the covered entities.  The relationships between covered entities and the for-profit, commercial pharmacies are governed by arm's-length contracts.  Contract pharmacies are not "agents" of the covered entities; they are merely business partners.  Indeed, large contract pharmacies like CVS and Walgreens charge "complex fees for pharmacy and administrative services  to  covered  entities"  that  increase  year  over  year.   Cassidy Report, *supra*, at 18. Importantly, these arrangements do not exist outside the context of the federal 340B Program, as there is no other context in which commercial pharmacies are able to share in the "spread" generated by selling manufacturers' discounted 340B drugs to their customers at full prices.

54.     Contract pharmacy arrangements generally use one of two inventory models: (1) pre-purchased inventory or (2) replenishment.

55.     A few contract pharmacies use the pre-purchased inventory model, in which a covered entity's 340B-purchased drugs are kept in stock at the contract pharmacy, and when filling prescriptions on behalf of that covered entity, the contract pharmacy uses the covered entity's 340B-purchased inventory.

56.     Most contract pharmacies, however, use what is known as the "replenishment" model.   The replenishment model is, as covered entities self-describe it, "an accounting mechanism" by which they retroactively match discounts for the pharmacy with previously (full price) dispensing events to customers.  *See AbbVie Inc. v. Murrill*, No. 6:23-CV-01307 (W.D. La. June 6, 2024) ("*Murrill*"), Summ. J. Hr'g Tr. at 59-60 (Ron Connelly, counsel for the Louisiana Primary Care Association); 61 Fed. Reg. at 43,555.  In practice, the replenishment model permits the "transfer" of 340B-priced drugs to contract pharmacies with the full knowledge that those drugs will be sold to any customer who comes in the door, whether 340B-eligible or not.

57.     Under the replenishment model, no 340B-purchased drugs are kept in stock at the contract pharmacy.  Instead, "the pharmacy has an initial stock of drugs" obtained through ordinary commercial purchases at the non-340B price (Figure 1, step 1).  *See Murrill* Summ. J. Hr'g Tr. at 60.  Initially, the contract pharmacy fills all prescriptions using its own non-340B purchased inventory (that is, full price inventory)—including those prescriptions issued by covered entities. As explained below, the pharmacy determines which previous dispenses were 340B eligible and once sufficient eligible dispenses for a particular drug accumulate, the covered entity orders additional quantities of that drug at the federal 340B price (Figure 1, step 6).  The covered entity directs AbbVie to transfer those drugs to the contract pharmacy to "replenish" the non-340B-priced drugs dispensed by the contract pharmacy on the covered entity's behalf (Figure 1, step 2).  *See* Decl. of RADM Krista M. Pedley, Dir., Off. of Pharmacy Affs., HRSA, *Eli Lilly & Co. v. Becerra*, No. 1:21-cv-00081, ECF No. 125-2 ¶¶ 3-11 (S.D. Ind.).  Sometimes the contract pharmacy actually places the order on behalf of the covered entity for more drugs at the federal 340B price.

**Figure 1.** Replenishment Model Step-By-Step.



58.     Once the contract pharmacy receives the replenishment order, the 340B-priced drugs are "placed on the shelf, become[] 'neutral inventory,' and may be dispensed to any subsequent patient" (Figure 1, step 3). *See id.* at ¶ 11.

59.     In other words, under the replenishment model, contract pharmacies do not keep a separate inventory of 340B-priced drugs but instead dispense drugs to both 340B and non-340B patients alike out of their general inventories.  Nor do most contract pharmacies attempt to determine prior to or at the point of sale whether the patient is eligible for a 340B-discounted drug. In almost all instances, contract pharmacies dispense the 340B-priced drugs to their customers at full price without knowledge as to whether, at the time of dispensing, that patient is a 340B-eligible patient (Figure 1, step 4).  The pharmacy or a third-party administrator ("TPA") carries out a 340B determination at the back end, well after a drug has been dispensed (and likely consumed) by the patient.  This determination is made using a black-box algorithm (unknown by AbbVie) based on the contract pharmacy's own criteria, without any involvement from the covered entities (Figure

1, step 5). If those criteria are designed correctly, the post-sale determination may be able to calculate how many 340B-priced drugs AbbVie must sell. But in reality, the contract pharmacies' criteria often include prior patients, who no longer receive the 340B-discounted drugs at the pharmacy but are included under a "once-a-patient-always-a-patient" approach, so the covered entity and its pharmacies are able to maximize the arbitrage profits from the 340B Program. As the D.C. Circuit observed, "[t]he covered entity, the pharmacy, and the third-party administrator often divvy up the spread between the discounted price and the higher insurance reimbursement rate. Each of these actors thus has a financial incentive to catalog as many prescriptions as possible as eligible for the discount." *Novartis*, 102 F.4th at 457-58.

60.    The replenishment model also encourages diversion by allowing covered entities to transfer federally discounted drugs to pharmacies, who are not "a patient of the entity." *See* 42 U.S.C. § 256b(a)(5)(B).

61.    Although HRSA interpreted the federal 340B statute to allow the use of pharmacies, it did so because "[w]e believe that the relationship between the covered entity and the contract pharmacy is one of agency." 61 Fed. Reg. at 43,554. Additionally, HRSA assumed that the covered entities purchasing the drugs would retain title and responsibility for them even after directing shipment to the contract pharmacy. *Id.* at 43,553. In practice, however, covered entities do not retain title to the drugs.

62.    As explained above, contract pharmacies (typically through a TPA) instruct covered entities to place orders—sometimes even placing the order itself without going through a covered entity—of additional quantities of drugs at the discounted 340B price to "replenish" the general inventories that they will use to supply non-340B-eligible sales. Significantly, as a result of such replenishment, even though the drugs are purchased by or on behalf of covered entities,

contract pharmacies effectively take title to the drugs.  At no point in time does a covered entity take title to the drugs under this model.  *See Sanofi Sues HHS, HRSA for Contract Details Between Covered Entities, Pharmacies*, 340B Report (June 13, 2024), https://tinyurl.com/bdmx88wu (according to a covered entity spokesperson, "in order for the replenishment model to function, 'the title to 340B drugs transfers to the contract pharmacy at the time it is taken into inventory'").  AbbVie is also not aware of any instance where a contract pharmacy or covered entity represents that an agency relationship exists between them such that the contract pharmacy acts at the direction of a principal covered entity.

63.    In practice, therefore, covered entities and contract pharmacies share in the "spread" generated by selling the drugs at higher prices to pharmacy customers and/or seeking full commercial reimbursement from the patients' insurance plans.  For-profit, commercial pharmacies thereby obtain significant profits from selling the 340B covered outpatient drugs that manufacturers must offer to covered entities at deeply discounted prices.

64.    By dramatically expanding the pool of individuals who can access the discounted drugs that covered entities can buy at discounted prices—including individuals who do not qualify as patients of the covered entity—covered entities and commercial pharmacies can obtain profits that extend far beyond Congress's intent when it created the 340B Program.  One study found that in 2018 alone, covered entities and their contract pharmacies generated approximately $64 billion in estimated gross profits from the purchase of manufacturers' drugs at mandated 340B prices.  *See* BRG Report, *supra*, at 7.  And a recent report from the U.S. Senate Committee on Health, Education, Labor & Pensions found that a covered entity in Virginia generated $276.5 million in 340B savings and revenue from September 2018 through September 2023, while another covered

entity in Ohio accrued $933.7 million in 340B savings and revenue from April 2020 through June 2023.  Cassidy Report, *supra*, at 6.

65.     When commercial pharmacies are brought into the Program, there is a significantly greater risk that manufacturers' discounted drugs will be dispensed to individuals who are not "patients" of the covered entity.  As HHS has found, contract pharmacy arrangements "create complications in preventing diversion" (for example, contract pharmacies cannot verify patient eligibility in real-time like a covered entity can).  HHS Office of Inspector General, *Contract Pharmacy Arrangements in the 340B Program*, OEI-05-13-00431, at 1 (2014) ("HHS Report"), https://oig.hhs.gov/oei/reports/oei-05-13-00431.pdf.

66.     Because contract pharmacies often dispense 340B covered outpatient drugs from the same inventory as drugs dispensed to all other customers (and seek replenishment after the fact), the opportunities for unlawful distributions to ineligible patients increases, allowing covered entities and contract pharmacies to profit from the diversion that Congress intended to prohibit. *See* U.S. Gov't Accountability Off., *Federal Oversight of Compliance at 340B Contract Pharmacies Needs Improvement*, GAO-18-480, at 44 (June 2018), https://www.gao.gov/assets/d18480.pdf (noting that approximately two-thirds of diversion findings in HRSA audits involved drugs distributed at contract pharmacies); *id.* at 35, 43-44 (finding 45% of covered entities that responded to a recent GAO survey admitted they do not provide any discount to patients who use their contract pharmacies, and many of the remaining 55% reported rarely giving discounts to patients obtaining medicines through contract pharmacies).

67.     Covered entities and commercial pharmacies reap windfalls from gaining access to manufacturers' drugs at deeply discounted prices under the federal 340B Program, but uninsured

and underinsured patients are not benefitting. *See* HHS Report, *supra*, at 2 (finding that "some covered entities in our study do not offer the discounted 340B price to uninsured patients at their contract pharmacies"); Cassidy Report, *supra*, at 9 (explaining that the covered entities under investigation "do not pass 340B discounts directly to their patients and differ on how patients receive discounts on their 340B drugs"); Adam J. Fein, *The Federal Program that Keeps Insulin Prices High*, Wall. St. J. (Sept. 10, 2020), https://tinyurl.com/yxehpc7v (explaining that "almost half the U.S. pharmacy industry now profits from the 340B program, which is designed as a narrow support to certain hospitals," while patients "don't benefit," even though manufacturers have "practically given the product away"); Rory Martin & Kepler Illich, *Are Discounts in the 340B Drug Discount Program Being Shared with Patients at Contract Pharmacies?*, IQVIA 12 (Sept. 27, 2022), https://tinyurl.com/2wdtuh52 ("The 340B Drug Discount Program as it exists today is a complex system of arbitrage … in which most vulnerable patients at contract pharmacies do not get drug discounts."); Lin JK et al., *Assessment of US Pharmacies Contracted with Health Care Institutions Under the 340B Drug Pricing Program by Neighborhood Socioeconomic Characteristics*, JAMA Health Forum 2 (June 17, 2022), https://tinyurl.com/4kvyn9ky (finding that contract pharmacy growth from 2011 to 2019 was concentrated in affluent and predominantly White neighborhoods and that the share of 340B pharmacies in socioeconomically disadvantaged and primarily non-Hispanic Black and Hispanic/Latino neighborhoods declined).

68.     For example, the North Carolina Department of the State Treasurer published a recent report explaining that "some hospitals are using the 340B program to enrich themselves rather than to serve vulnerable communities," and that the hospitals "expanded into wealthier neighborhoods with a higher percentage of insured individuals who pay more for the drugs." Dale R. Folwell, N.C. Dep't of State Treasurer, *Overcharged: State Employees, Cancer Drugs, and the*

*340B Drug Pricing Program*, N.C. State Health Plan 3, https://tinyurl.com/4cy8an69.  Vermont is no different: nearly half of Vermont's contract pharmacies are located in affluent neighborhoods. *See* Pioneer Institute Public Policy Research, *340B In Vermont* (2025), https://tinyurl.com/47yp5m63.

69.     While commercial pharmacies are driving massive growth in the 340B Program—at double-digit annual rates—charity care by hospitals has decreased.  Commentators have noted, for example, that as the 340B Program has grown at a remarkable rate, the total value of hospitals' uncompensated care has significantly declined.  *See* Letter from Adam J. Fein to Hon. Lamar Alexander and Hon. Greg Walden in response to request for input on 340B drug pricing program, 7-8 (Oct. 30, 2020), https://tinyurl.com/4s5ptxxy; Adam J. Fein, *EXCLUSIVE: 340B Program Purchases Reach $24.2 Billion—7%+ of the Pharma Market—As Hospitals' Charity Care Flatlines*, Drug Channels (May 14, 2019), https://tinyurl.com/4z8dmjsv.

70.     Both the New York Times and Wall Street Journal have run exposés describing the flaws in contract pharmacy arrangements, flaws that enable large scale arbitrage and damage the very communities that the federal 340B Program was designed to help.  *See* Katie Thomas & Jessica Silver-Greenberg, *Profits Over Patients: How a Hospital Chain Used a Poor Neighborhood to Turn Huge Profits*, NY Times (Sept. 24, 2022), https://tinyurl.com/3sbxuswa (describing how one 340B hospital "has been slashing services at Richmond Community while investing in the city's wealthier, white neighborhoods, according to more than 20 former executives, doctors and nurses"); Anne Wilde Mathews et al., *Many Hospitals Get Big Drug Discounts. That Doesn't Mean Markdowns for Patients*, Wall. St. J. (Dec. 20, 2022), https://tinyurl.com/yc2uc6yp ("The data show that hospitals often extend their 340B discounts to

clinics in well-off communities, where they can charge privately insured patients more than those on Medicaid" which "raise questions about the program's growth and purpose.").

71.    A recent New York Times investigation into Apexus, the government contractor managing 340B drug pricing, exposed systemic price manipulation, lack of oversight, and financial exploitation within contract pharmacy arrangements—allowing for significant financial abuse at the expense of the communities the Program was meant to protect.  Apexus, which is responsible for negotiating better prices and access to mediations, has a direct financial incentive to expand the Program and maximize hospital profits.  Because Apexus "is allowed to collect a fee for almost every drug sold under the program," it has actively developed strategies to drive 340B sales and increase covered entity revenue.  These strategies include training covered entities on how to maximize 340B revenue; operating a "purchasing optimization team"; advising hospitals on which drugs generate the highest margins; and running a certification program teaching hospitals how to capture more patients and prescriptions under 340B.  These tactics have prioritized profit generation over patient benefit, increasing Apexus's and covered entities' financial gains at the expense of patients, insurers, and manufacturers.  Hospitals face no restrictions on which outpatient prescriptions they classify as 340B, allowing them to mine patient records from as far back as 36 months to claim additional patients under the Program—even if those patients never directly benefit from the discounts.  In some cases, hospitals have passed inflated drug costs onto patients instead of sharing the savings.  *See* Ellen Gabler, *How a Company Makes Millions Off a Hospital Program Meant to Help the Poor*, N.Y. Times (Jan. 15, 2025), https://tinyurl.com/33ftpfdf.

72.    Congress has also expressed concern over growing abuses in the 340B Program.  On April 24, 2025, the Majority Staff of the Senate Health, Education, Labor & Pensions

("HELP") Committee, chaired by Senator Cassidy, released a report titled "Congress Must Act to Bring Needed Reforms to the 340B Drug Pricing Program,"—the culmination of a nearly two-year investigation into contract pharmacy arrangements and other 340B-related issues.  In its findings, the Senate HELP Committee determined that not only have contract pharmacies grown by sheer numbers, but major commercial pharmacy chains like CVS, Walgreens, Express Scripts, OptumRx, and Walmart account for 75% of all contract pharmacy relationships.  *See* Cassidy Report, *supra*, at 3.

73.    As part of the Senate HELP Committee's investigation, several covered entities expressly told Congress that they do not pass on discounts to patients and do not specifically account for 340B revenue in their budgets.  *See id.* at 10.  And large commercial pharmacy chains like CVS and Walgreens disclosed that they collect significant fees associated with 340B dispensing.  For example, for patients with third-party insurance, CVS collects between $35 and $85 per brand-name drug dispensing event depending on the days-supply of the prescription dispensed.  *Id.* at 18.  CVS reported to the Committee that in 2023 it made $382 million in 340B-related dispensing fees and "annual gross and net revenues generated from the 340B program." *Id.* at App. 106.  Operating as contract pharmacies is so lucrative that CVS and Walgreens disclosed manufacturers' 340B abuse reform efforts as a material risk to their business in their annual reports.  *See* CVS Pharmacy 10-K (2022) at 22, https://tinyurl.com/mpwpre9x; Walgreens, Inc. 10-K (2022) at 28, https://tinyurl.com/mu6tfzcu.

74.    While the replenishment model contributes to the abuses described above—issues manufacturers are rightfully trying to address—H.B. 266 goes further: it mandates that manufacturers sell or transfer discounted drugs on terms Congress never required and that manufacturers never agreed to.  The injuries manufacturers face under H.B. 266 do not stem from

the 340B Program itself or even from the replenishment model specifically, but from Vermont's attempt to override federal law and impose *state* requirements on AbbVie's participation in a *federal* program.  Even if the replenishment model were eliminated entirely, H.B. 266 would still compel manufacturers to transfer property under conditions they oppose, stripping them of their federal statutory right to impose reasonable limitations on their 340B offers.  In doing so, H.B. 266 not only conflicts with federal law—it also effects a taking.  The statute forces manufacturers to sell valuable property at below-market rates, to third parties, with no room to impose conditions or decline a sale.

### C.    AbbVie's and Other Manufacturers' Response to HRSA's Overreach

75.    AbbVie and other manufacturers have exercised their lawful right to decline covered entity requests that manufacturers provide their discounted 340B-priced drugs to an unlimited number of commercial pharmacies.

76.    AbbVie has implemented initiatives making clear that it will not indiscriminately accept requests that it transfer 340B-discounted drugs to an unlimited number of third-party commercial contract pharmacies servicing covered entities.

77.    As 340B abuse continued to grow, with covered entities seeking the provision of 340B-priced drugs to an excessive number of for-profit pharmacies—sometimes located more than 100 miles from the covered entity's location—AbbVie updated its policy to place reasonable limits around provision to contract pharmacies.  Specifically, if a covered entity has its own in-house pharmacy, AbbVie's policy now is to only take orders for the in-house pharmacy.  However, if a covered entity does not have an in-house pharmacy capable of dispensing to outpatients, AbbVie will take orders for one designated contract pharmacy, provided that the one contract pharmacy is located within 40 miles of the HRSA-registered covered entity parent site, and that the covered entity submits limited claims data on 340B utilization for that pharmacy location.  In addition,

Grantee Covered Entities may use an unlimited number of contract pharmacies as long as the Grantee registers with 340B ESP™, a web-based platform made available to covered entities at no cost, and submits claims data. *See* Ltr. from E. Scheidler to 340B Covered Entities (Sept. 23, 2025), https://tinyurl.com/3pw7t8nk.

78.    In implementing its initiatives, AbbVie has confirmed that it will continue to offer "each covered entity" the ability to "purchase" its covered outpatient drugs "at or below the applicable ceiling" price set by statute. *See* 42 U.S.C. § 256b(a)(1). AbbVie is committed to ensuring that each hospital covered entity has at least one pharmacy location where it can receive shipments of discounted AbbVie medicines, and out of which it can dispense AbbVie's 340B-discounted drugs to qualifying patients. If a hospital covered entity is unable to identify an eligible contract pharmacy within 40 miles, AbbVie will work with the covered entity to identify a suitable alternative.

79.    AbbVie's policy is consistent with those upheld by the Third and D.C. Circuits. *See Sanofi*, 58 F.4th at 701; *Novartis*, 102 F.4th at 463-64.

80.    In addition to AbbVie, many other pharmaceutical manufacturers have adopted policies directed at addressing abuses of the 340B Program by covered entities and contract pharmacies.

**D.    Litigation in Federal Courts**

81.    HHS initially recognized that it lacked authority to compel manufacturers to transfer drugs to contract pharmacies. *See* Tom Mirga, *HRSA Says Its 340B Contract Pharmacy Guidance Is Not Legally Enforceable*, 340B Report (July 9, 2020), https://340breport.com/hrsa-says-its-340b-contract-pharmacy/. The agency then reversed its position and attempted to impose a new obligation on manufacturers.

28

82.     On December 30, 2020, HHS issued a final decision—labeled an "Advisory Opinion"—that for the first time ever purported to require manufacturers to facilitate the transfer of their products to for-profit commercial pharmacies.  *See* U.S. Dep't of Health & Hum. Servs., Advisory Op. No. 20-06, Contract Pharmacies Under the 340B Program, at 1 (Dec. 30, 2020), also available at https://tinyurl.com/2ca6rmnm.  Various manufacturers brought suit in early 2021 to challenge this HHS decision.

83.     On May 17, 2021, the government sent certain manufacturers "violation" letters purporting to enforce the 340B statute.  AbbVie received a violation letter on October 17, 2022, stating that HHS had made a final determination that AbbVie's policy violated the 340B statute by not agreeing to transfer 340B-discounted drugs to unlimited contract pharmacies because "AbbVie's actions have resulted in overcharges."  *See* U.S. Dep't of Health & Hum. Servs., Violation Letter to AbbVie (Oct. 17, 2022), also available at https://tinyurl.com/47ybp3kw.

84.     While the December 30 Advisory Opinion was later withdrawn following a ruling from the United States District Court for the District of Delaware, *see AstraZeneca*, 543 F. Supp. 3d at 47, the previously issued violation letters were not withdrawn.

85.     Vermont filed amicus briefs in the Third and D.C. Circuits in support of HHS, expressing disapproval of the manufacturers' policies.  *See* Brief of Amicus Curiae States, *Sanofi*, 58 F.4th 696 (3d Cir. 2023) (Nos. 21-3167 et. al), 2022 WL 1617655; Corrected Brief of Amicus Curiae States, *Novartis*, 102 F.4th 452 (D.C. Cir. 2024) (Nos. 21-5299 et al.), 2022 WL 1644996.

86.     On January 30, 2023, the Third Circuit issued a decision recognizing that Congress intentionally "chose not to" impose delivery-related obligations on manufacturers, explaining that the federal 340B statute's plain text suggests that Congress intended "one-to-one transactions

between a covered entity and a drug maker without mixing in a plethora of pharmacies." *See Sanofi*, 58 F.4th at 704.

87.    The Third Circuit further found that manufacturers' policies do not prevent covered entities from participating in the 340B Program or entering into contractual relationships with commercial pharmacies.  Under manufacturers' policies, covered entities "can still buy and dispense unlimited discounted drugs by having them delivered to an in-house or contract pharmacy." *Id*. at 703.

88.    The Third Circuit rejected the argument that manufacturers were not permitted to address 340B Program abuses, such as diversion and duplicate discounting, by imposing restrictions on when they will transfer drugs to commercial pharmacies.

89.    On May 21, 2024, the D.C. Circuit issued its own opinion endorsing the same view, holding that "section 340B merely requires manufacturers to propose to sell covered drugs to covered entities at or below a specified monetary amount." *Novartis*, 102 F.4th at 460.  As a result, as long as a manufacturer's policy "neither precludes [it] from making a bona fide 'offer' nor increases its contract 'price'"—such as only "deliver[ing] section 340B drugs to a covered entity's in-house pharmacy or to a single contract pharmacy designated by the covered entity"—the condition is legitimate and may be enforced without running afoul of Section 340B.  *Id.* at 463-64.

90.    In the face of those federal decisions, several states enacted their own laws trying to achieve what HHS could not.  Those state laws—passed in Arkansas, Colorado, Louisiana, Maine, Maryland, Mississippi, Missouri, Nebraska, North Dakota, Oklahoma, Rhode Island, West Virginia, South Dakota, and Utah, among others—eliminate manufacturers' ability to condition their 340B offers and force manufacturers to transfer their drugs to an unlimited number of contract pharmacies at the 340B-discounted prices.  A new round of federal litigation commenced.

Manufacturers challenged the laws as unconstitutional on several grounds, and that litigation continues today.

91.     Some courts have allowed the state laws to take effect.  *See, e.g.*, *PhRMA v. McClain*, 95 F.4th 1136 (8th Cir. 2024) (Arkansas).  By contrast, the Southern District of West Virginia preliminarily enjoined West Virginia's contract-pharmacy law, holding that the law unconstitutionally conflicted with Section 340B.  *Morrisey*, 760 F. Supp. at 451-60.  The West Virginia court found that laws like Vermont's H.B. 266 regulate "price, not delivery."  *Id.* at 455.  Under such laws, "[t]he question is only about what price the pharmacy and the covered entity will pay."  *Id.*  In other words, "the system is about delivery ***at a given price***, not delivery *per se*."  *Id.*

92.     The Western District of Oklahoma also preliminarily enjoined Oklahoma's contract-pharmacy law, holding that manufacturers were likely to succeed on the merits of both their preemption and takings claims.  *Drummond*, 2025 WL 3048929, at *4-10.  Regarding preemption, the Oklahoma court found that Oklahoma's H.B. 266 analog impermissibly regulates price rather than delivery and conflicts with the federal 340B Program's dispute resolution mechanism.  *Id.* at *4-8.  The Oklahoma court also held that the Oklahoma law effectuates unconstitutional takings on the grounds that it compels sales for a private rather than public purpose and provides no just compensation.  *Id.* at *8-9.  Notably, the Oklahoma court rejected the notion that a manufacturer's participation in the ***federal*** 340B Program constituted acquiescence to a ***state's*** appropriation of the manufacturer's property.  *Id.* at *8.

93.     Other cases await decisions in district court, and appeals are now pending before the U.S. Courts of Appeals for the First, Fourth, Fifth, and Tenth Circuits.

**E.     The Inflation Reduction Act and HRSA's Rebate Model Pilot Program**

94.     The Inflation Reduction Act of 2022 established the so-called "Drug Price Negotiation Program" (DPNP).  *See* 42 U.S.C. § 1320f.

95.    The DPNP requires the Secretary of HHS to set a "maximum fair price" ("MFP") in Medicare for drugs selected under the DPNP.  *See id.* § 1320f(a)(3).

96.    If they want to continue participating in Medicare and Medicaid, manufacturers of "selected drugs" are obligated to make the MFP available to all eligible individuals, which generally includes drugs dispensed by hospitals and pharmacies that provide care to Medicare-covered individuals.  *Id.* §§ 1320f(c)(2), 1320f-2(a)(3).

97.    Failure to provide access to the MFP can subject a manufacturer to significant civil monetary penalties that can reach into the millions of dollars per day.  *Id.* §§ 1320f-6(c), 1320f-2(a)(5).

98.    The Centers for Medicare & Medicaid Services (CMS)—the agency tasked with administering the DPNP—has to-date selected a MFP for one drug that AbbVie manufactures: Imbruvica, which treats certain blood cancers.  CMS, *Medicare Drug Price Negotiation Program: Selected Drugs for Initial Price Applicability Year 2026*, https://tinyurl.com/2584m4h7.

99.    The MFP for Imbruvica is set to go into effect on January 1, 2026.  CMS, *Medicare Dug Price Negotiation Program: Negotiated Prices for Initial Price Applicability Year 2026*, https://tinyurl.com/mr4c67rz.

100.    Separately, the DPNP contemplates that an individual eligible to receive the MFP for a selected drug may sometimes (or even often) receive the drug at a 340B hospital or contract pharmacy, and that the dispensed drug may also be subject to a PPA under the 340B statute.  To that end, the DPNP contains an MFP-340B nonduplication provision.  42 U.S.C. § 1320f-2(d). That provision obligates the manufacturer of a drug that is subject to both the MFP and a PPA to provide ***only*** the lower of the two price concessions—but not both.  *See id.*

101.    CMS has disclaimed any responsibility for identifying and deduplicating MFP-340B dispenses.  *See* CMS, *Medicare Drug Price Negotiation Program: Final Guidance, Implementation of Section 1191-1198 of the Social Security Act for Initial Price Applicability Year 2027 and Manufacturer Effectuation of the Maximum Fair Price in 2026 and 2027*, at 231 (Oct. 2, 2024), https://tinyurl.com/ychztdfu ("2027 Guidance") ("CMS will not, at this time, assume responsibility for nonduplication of discounts between the 340B ceiling price and MFP."); *id.* at 54 ("Neither CMS nor the [contract facilitating data flow between CMS, manufacturers, and providers] will verify that a claim was or was not billed as a 340B-eligible drug.").

102.    This leaves avoiding duplicate MFP-340B discounts in the hands of manufacturers like AbbVie.  Indeed, that is precisely the result that CMS intends:  "CMS strongly encourages manufacturers to work with dispensing entities, covered entities and their 340B TPAs, and other prescription drug supply chain stakeholders (e.g., wholesalers) to facilitate access to the lower of the MFP and the 340B ceiling price, wherever applicable."  *Id.* at 232.

103.    Claims data is the only feasible method for identifying when a rebate is warranted and ensuring compliance with the DPNP's nonduplication provisions because it enables manufacturers to quickly and accurately identify which dispenses were both MFP- and 340B-eligible.

104.    After widespread concern about the significant nonduplication issues facing manufacturers with both a selected drug and a PPA, HRSA issued a notice calling for applications to implement a pilot program rebate model for effectuating the 340B price to covered entities and contract pharmacies.  *See* 90 Fed. Reg. 36,163 (Aug. 1, 2025).  The Rebate Program—which AbbVie applied to participate in—arises primarily out of concerns addressed to "340B and Maximum Fair Price … deduplication" for manufacturers (like AbbVie) that have drugs subject

to both price concessions. *See id.* Notably, under the Rebate Program, "[c]overed entities are **required** to provide [claims] data to participating manufacturers in order for the manufacturers to provide rebates to effectuate the 340B discount on the entities' covered outpatient drug purchases." 90 Fed. Reg. 44,197, 44,198 (Sept. 12, 2025) (emphasis added).

105.    On October 30, 2025, HRSA approved AbbVie's application to participate in the Rebate Program, which will begin on January 1, 2026. *See* HRSA, 340B Rebate Model Pilot Program, https://tinyurl.com/yzd3dvep. HRSA's approval notice expressly lists a series of "data fields … for covered entity submission in order to effectuate the rebate," including, but not limited to, "Date of Service," "Date Prescribed," "Rx number," "Fill number," "Quantity Dispensed," "Prescriber ID," and "340B ID." *Id.* This explicitly authorizes the collection of claims data.

### F.    The Vermont Law

106.    After federal courts concluded that the federal 340B statute grants manufacturers the freedom to adopt policies to combat contract-pharmacy abuse, Vermont turned to its own legislature to take that freedom away.

107.    The Vermont legislature introduced legislation, H.B. 266, to limit manufacturers' right to attach reasonable conditions to the federal 340B offer made to covered entities. Vermont's legislature passed H.B. 266 and Governor Phil Scott signed it into law. H.B. 266 took immediate effect. *See* H.B. 266 § 6(b).

108.    The text of H.B. 266 makes clear that changing the terms of the federal 340B Program and compelling a private wealth transfer of 340B-priced drugs from one party to another are its regulatory objects.

109.    Start with its key defined terms. H.B. 266 defines "340B drug" as "a drug that has been subject to any offer for reduced prices by a manufacturer pursuant to 42 U.S.C. § 256b [(*i.e.*, the federal 340B statute)] and is purchased by a 340B covered entity." Vt. Stat. Ann. tit. 18,

34

§ 4681(3).  H.B. 266 defines "340B covered entity"—another critical term—by referencing the federal 340B statute and as including "a 340B covered entity's pharmacy." *Id.* § 4681(2).  In other words, Vermont's statute cannot exist without the federal 340B Program.  It regulates only transactions occurring (or not occurring) within the 340B Program.

110.    Next is the main point of H.B. 266: it compels manufacturers to transfer discounted 340B drugs to commercial pharmacies.  "A manufacturer or its agent shall not deny, restrict, prohibit, or otherwise interfere with, directly or indirectly, the acquisition of a 340B drug by or delivery of a 340B drug to a 340B contract pharmacy on behalf of a 340B covered entity unless receipt … is prohibited by [HHS]." *Id.* § 4682(a).  It thereby revokes what the federal 340B statute granted: manufacturers' liberty to adopt terms and policies that prevent unlawful transactions and other abuses of the 340B Program.  Notably, H.B. 266 does not define "interfere," or give any notice as to what would constitute unlawful "indirect[]" interference.

111.    As a practical matter, H.B. 266 also expands the pool of entities authorized by Congress to receive drugs purchased at 340B prices.  By sweeping in "340B contract pharmac[ies]," Vermont demands that manufacturers provide commercial contract pharmacies unfettered access to their drugs at discounted 340B prices. *Id.* §§ 4681(1), 4682(a).  But that is contrary to what Congress intended and enacted. *See* 42 U.S.C. § 256b(a)(5)(B) (providing that "a covered entity shall not resell or otherwise transfer the drug to a person who is not a patient of the entity"); *see also id.* § 256b(a)(4) (defining "covered entity" so as not to include contract pharmacies).

112.    The Vermont Commissioner of Health is empowered to report violations of H.B. 266 to a State's Attorney or the Attorney General.  Vt. Stat. Ann. tit. 18, § 8; Vt. Stat. Ann. tit. 3, § 152.  Upon receiving a report, they "shall cause proceedings to be commenced and prosecution

in the proper court without delay." Vt. Stat. Ann. tit. 18, § 8.  Further, "[a] 340B covered entity, 340B contract pharmacy, or other person injured by a manufacturer's or its agent's violation of this subchapter may bring an action in Superior Court for injunctive relief, compensatory and punitive damages, costs and reasonable attorney's fees, and other appropriate relief." Vt. Stat. Ann. tit. 18, § 4684(a).  A manufacturer commits a "violation" for "each **_package_** of 340B drugs that is subject to a discriminatory action by a manufacturer or its agent." *Id.* § 4684(b) (emphasis added).  For each violation, a manufacturer may owe a fine of up to $100.  Vt. Stat. Ann. tit. 18, § 7.  H.B. 266 also authorizes "injunctive relief, compensatory and punitive damages, costs and reasonable attorney's fees, and other appropriate relief." *Id.* § 4684(a).

113.    At the same time, H.B. 266 makes it all but impossible for AbbVie to ensure rudimentary compliance with the 340B Program and avail itself of federal 340B ADR procedures.  Vermont's law prohibits manufacturers from "directly or indirectly requir[ing] a 340B covered entity to submit any claims, utilization, encounter, purchase, or other data as a condition for allowing the acquisition of a 340B drug by or delivery of a 340B drug to a 340B contract pharmacy unless the claims or utilization data sharing is required by [HHS]." *Id.* § 4682(b).  Such data is critical, however, to manufacturers' ability "to utilize the federal dispute resolution system." *Morrisey*, 760 F. Supp. 3d at 453; *see also Drummond*, 2025 WL 3048929, at *7.

114.    Claims data is also essential to participation in HRSA's Rebate Program.  H.B. 266 further frustrates AbbVie's ability to participate in the Rebate Program by prohibiting manufacturers from "offer[ing] or otherwise mak[ing] available 340B drug pricing in the form of a rebate," requiring manufacturers to instead "make available 340B drug pricing … in the form of a discount at the time of purchase." Vt. Stat. Ann. tit. 18, § 4682(d).  HRSA's **_Rebate_** Program

necessarily involves manufacturers providing 340B pricing through after-the-fact **rebates** rather than upfront discounts.

115.    H.B. 266's rebate prohibition further conflicts with the federal 340B statute, which states that manufacturers may make the 340B price available to covered entities by either "rebate or discount." 42 U.S.C. § 256b(a)(1).

116.    H.B. 266 cites no source, under the 340B statute or elsewhere, that authorizes Vermont to add requirements to the conditions for participating in the federal 340B Program, to expand the pool of entities permitted to benefit from 340B pricing, to compel the transfer of AbbVie's property at confiscatory prices for private use, to constrain AbbVie's ability to participate in HRSA's Rebate Program, or to establish an enforcement process that, on one hand, allows third parties to seek remedies for alleged violations of the federal 340B requirements and, on the other hand, frustrates AbbVie's ability to utilize the enforcement measures Congress created.

## STANDING

117.    AbbVie is financially injured by H.B. 266 because H.B. 266 forces AbbVie to complete more heavily discounted sales than it otherwise would.  H.B. 266 does this by overriding the discretion manufacturers retain under federal law to impose reasonable conditions on their 340B offers and subjecting AbbVie to conflicting obligations, compliance burdens, and potential enforcement actions.  The law forces AbbVie to provide its private property to another private party in a prohibited A-to-B wealth transfer.  The law subjects AbbVie to state enforcement through the Commissioner's power to report H.B. 266 violations for prosecution and third-party enforcement in the form of civil suits designed to impose steep financial penalties.

118.    AbbVie's injuries are fairly traceable to H.B. 266 because the state statute compels a private transfer of AbbVie's 340B-discounted drugs to private, for-profit commercial

pharmacies—in the absence of any recognized public use or purpose and in violation of federal law. H.B. 266 compels sales at the discounted price against AbbVie's wishes and on terms it would not agree to; in other words, in the absence of H.B. 266, those sales or other transfers to covered entities and their contract pharmacies at the discounted price *would not occur*. The statute prohibits AbbVie from enforcing its contract pharmacy policy, but AbbVie will not sell at the 340B price absent agreement to its contract pharmacy policy. H.B. 266 thus compels a transaction that would not take place but for the state's law. Put differently, the existence and enforcement of H.B. 266 results in the difference between a sale at the discounted price occurring or not. In addition, the statute seeks to impose new state-law obligations on drug manufacturers participating in the 340B Program beyond those required by the federal statute. Neither section 340B, nor any existing regulation, nor the PPA, contains these requirements. Moreover, H.B. 266 purports to authorize anyone affected in any way to enforce the Act in a way that violates federal law and infringes on AbbVie's property rights.

119.    A favorable ruling is likely to redress AbbVie's injuries. Enjoining the provisions of H.B. 266 that unconstitutionally force the taking of manufacturers' private property for no public use would redress AbbVie's injuries because AbbVie's property would not be unconstitutionally taken, and AbbVie would not be exposed to state-imposed penalties for exercising its rights under the 340B Program and the Constitution. Similarly, a declaratory judgment would redress AbbVie's injuries because AbbVie would not be exposed to enforcement actions, accumulating penalties.

## BASIS FOR INJUNCTIVE RELIEF

120.    "Irreparable harm can be found where there is a continuing wrong which cannot be adequately redressed by final relief on the merits. Such harm often resides where money damages cannot provide adequate compensation." *N.Y. Pathological & X-Ray Lab'ys, Inc. v. Immigr. &*

*Naturalization Serv.*, 523 F.2d 79, 81 (2d Cir. 1975). Moreover, monetary losses constitute irreparable harm when monetary damages are unavailable due to sovereign immunity. *Entergy Nuclear Vermont Yankee, LLC v. Shumlin*, 733 F.3d 393, 423 (2d Cir. 2013) (finding irreparable harm when plaintiff "would be unable to recover monetary damages from Vermont because of the Eleventh Amendment"); *see also Odebrecht Constr., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1289 (11th Cir. 2013) (quoting *Chamber of Com. v. Edmondson*, 594 F.3d 742, 770-71 (10th Cir. 2010)) ("[N]umerous courts have held that the inability to recover monetary damages because of sovereign immunity renders the harm suffered irreparable."); *see also Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 765 (2021) ("The moratorium [on collecting rent during the COVID-19 pandemic] has put the applicants, along with millions of landlords across the country, at risk of irreparable harm by depriving them of rent payments with no guarantee of eventual recovery.").

121.    "[A]n alleged deprivation of a constitutional right" is also sufficient on its own to show irreparable injury—"no further showing" is required. *Hartford Courant Co., LLC v. Carroll*, 986 F.3d 211, 224 (2d Cir. 2021) (quoting *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984)). Because H.B. 266 violates AbbVie's constitutional rights, AbbVie will suffer irreparable harm absent an injunction.

122.    A taking occurs each and every time a drug manufacturer is required against its own volition to transfer its drugs at the 340B-discounted price to a commercial pharmacy for the private benefit of that for-profit pharmacy. Effecting an unconstitutional taking of AbbVie's private property in a forced transfer to another private party for no recognized public use or purpose constitutes an irreparable injury. *See Hartford Courant Co.*, 986 F.3d at 224; *see also, e.g., Laclede*

39

*Gas Co. v. St. Charles County*, 713 F.3d 413, 419-20 (8th Cir. 2013) (affirming grant of preliminary injunction on takings claim).

123.    Further, if H.B. 266 is not enjoined as applied to AbbVie, AbbVie would be exposed to additional state law requirements as a condition of participating in the federal 340B Program.  A party may be irreparably injured in the face of the threatened enforcement of a preempted law.  *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992); *Metropolitan Taxicab Bd. of Trade v. City of N.Y.*, 615 F.3d 152 (2d Cir. 2010) (affirming preliminary injunction of city regulations preempted by federal statute); *see also Petroleum Expl., Inc. v. Pub. Serv. Comm'n of Ky.*, 304 U.S. 209, 218-19 (1938) ("It is true that the injury which flows from the threat of enforcement of an allegedly unconstitutional, regulatory state statute with penalties so heavy as to forbid the risk of challenge in proceedings to enforce it, has been generally recognized as irreparable and sufficient to justify an injunction.").

124.    If drug manufacturers such as AbbVie are required to provide their drugs to contract pharmacies, the magnitude of the economic loss is likely beyond the capacity of Vermont to compensate with damages.  Discounted purchases under the Program reached approximately $66.3 billion for fiscal year 2023 in the United States.  *See* Health Res. & Servs. Admin., *2023 340B Covered Entity Purchases* (Oct. 2024), https://tinyurl.com/56nzphvm.

125.    Any attempt to subsequently recover losses from Vermont would likely be barred by the doctrine of sovereign immunity under the Eleventh Amendment.  That alone renders AbbVie's financial losses "irreparable injury" for purposes of seeking an injunction.  *Entergy Nuclear Vermont Yankee*, 733 F.3d at 423.

126.    The cost to AbbVie of complying with state laws like Vermont's is substantial.  For example, AbbVie estimates that the cost of complying with similar state laws in Mississippi and

Missouri last year cost AbbVie around $33.1 million and $35 million, respectively.  Complying with Vermont's law will cost AbbVie tens of millions of dollars per year (if not more).  And as the number of states adopting these kinds of laws increases, so does the irreparable harm imposed.

127.    As of filing, at least 19 other states have already passed contract-pharmacy laws akin to Vermont's H.B. 266—but with material differences among and between those state laws, complicating compliance and subjecting manufacturers to different and varying enforcement:

| | AR | CO | HI | LA | MD | ME | MN | MO | MS | ND | NE | NM | OK | OR | RI | SD | TN | UT | VT | WV |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Restricts collection of claims data | – | ✓ | – | – | – | ✓ | – | – | – | ✓ | ✓ | ✓ | – | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Defines "340B entity" to include pharmacies | – | – | – | ✓ | – | ✓ | – | – | ✓ | ✓ | – | – | ✓ | – | – | – | ✓ | ✓ | – | – |
| Applies only to certain 340B covered entities | – | – | – | – | – | – | – | – | – | – | – | ✓ | – | – | – | – | – | – | – | – |
| Prohibits conditioning 340B offers on receipt of contracts | | | | | | | | | | | | | | | | | | ✓ | | |
| Requires "acquisition" by a pharmacy or entity | – | ✓ | ✓ | ✓ | ✓ | ✓ | – | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Requires delivery to any location | – | ✓ | – | – | – | – | – | – | – | – | ✓ | – | – | – | – | ✓ | ✓ | ✓ | – | ✓ |
| Prohibits "interfering" with "eligible patients" or pharmacies | – | – | – | – | – | ✓ | – | – | – | ✓ | – | ✓ | ✓ | – | ✓ | – | – | – | ✓ | – |
| Prohibits use of rebates | – | – | – | – | – | – | – | – | – | ✓ | – | – | – | – | – | – | – | – | ✓ | – |
| Restricts right to impose time limits on | | | | | | | | | | | | | | | | | | ✓ | | |

41

| | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| replenish-ment orders | | | | | | | | | | | | | | | | | | | | |
| Applies to an "agent" or "affiliate" | – | ✓ | ✓ | – | – | ✓ | – | ✓ | – | – | ✓ | ✓ | – | – | ✓ | – | ✓ | ✓ | ✓ | ✓ |
| Imposes criminal sanctions | – | – | ✓ | – | ✓ | – | – | – | ✓ | ✓ | – | ✓ | ✓ | – | – | – | ✓ | ✓ | – | – |
| Creates a private right of action | – | ✓ | ✓ | – | – | ✓ | – | – | – | – | – | – | – | – | ✓ | ✓ | ✓ | – | ✓ | – |

128.    Prospective injunctive relief is appropriate because of the ongoing nature of the infringement of constitutional rights resulting from H.B. 266.  That is, the law effects a repeated and ongoing mandatory private wealth transfer of AbbVie's 340B-discounted drugs to private, for-profit commercial pharmacies for the private benefit of that pharmacy and for no recognized public use, in violation of the U.S. Constitution.  The law deprives AbbVie and other manufacturers of their federal rights under the actual terms of the 340B Program.  And H.B. 266 threatens to impose significant penalties upon manufacturers if they do not capitulate to Vermont's attempt to modify the terms of the federal 340B Program.  The deprivation of constitutional rights constitutes irreparable injury for purposes of a preliminary injunction.  *See, e.g., Hartford Courant Co.*, 986 F.3d at 224; *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) ("The district court therefore properly relied on the presumption of irreparable injury that flows from a violation of constitutional rights.").

129.    Prospective injunctive relief is appropriate even if the Court finds that Vermont's taking is for public use.  AbbVie's rights are violated the moment of the taking. *Knick v. Twp. of Scott, Pa.*, 588 U.S. 180, 190 (2019).  Once that occurs, AbbVie has recourse against Vermont as state law does not provide AbbVie with a remedy and the Eleventh Amendment bars a suit for

monetary relief brought under 42 U.S.C. § 1983.  *See Quern v. Jordan*, 440 U.S. 332, 340 (1979); *Edelman v. Jordan*, 415 U.S. 651, 663 (1974).

130.    Granting injunctive relief here would not harm Vermont.  It is well settled that states do "not have an interest in the enforcement of an unconstitutional law."  *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) (quoting *Am. C.L. Union v. Ashcroft*, 322 F.3d 240, 247 (3d Cir. 2003)).  Moreover, there is no evidence that uninsured and needy patients—in Vermont or anywhere else—benefit from the use of contract pharmacies.  Vermont has no legitimate interest in enriching commercial pharmacies at the expense of manufacturers and patients.

131.    Granting injunctive relief would also be in the public interest.  The public has no interest in unconstitutional laws being enforced, particularly those that force a transfer of private property for no public use or purpose.  By contrast, the public has a strong interest in preventing states from imposing unconstitutional requirements that force the transfer of private property for the private benefit of private commercial parties.  Further, the public has a strong interest in enforcing federal law, not permitting states to change the requirements for participating in federal healthcare programs, and not permitting states to inhibit efforts to effectively administer interrelated federal healthcare programs.

### FIRST CLAIM FOR RELIEF

***Declaratory/Injunctive Relief – Federal Preemption By 340B Program:***
***Supremacy Clause, U.S. Const. art. VI, cl. 2***

132.    AbbVie re-alleges and incorporates by reference all of the allegations contained in the preceding paragraphs of this complaint as though set forth fully herein.

133.    Under the Supremacy Clause of the Constitution, federal law is "the supreme Law of the Land … , any Thing in the Constitution or Laws of any State to the Contrary

notwithstanding." U.S. Const. art. VI, cl. 2. As a result, federal statutes enacted by Congress can preempt state law. *See, e.g.*, *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000).

134. Preemption can take multiple forms: "Congress may preempt (or invalidate) a state law by means of a federal statute. It may preempt state law expressly or it may preempt state law implicitly…." *Galper v. JP Morgan Chase Bank, N.A.*, 802 F.3d 437, 443 (2d Cir. 2015).

135. One type of preemption is conflict preemption. Conflict preemption occurs where it is impossible for a private party to comply with both state and federal law or where "the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)) (alterations omitted). Vermont's H.B. 266 conflicts with or otherwise obstructs Congress's 340B Program in multiple ways.

136. H.B. 266 conflicts with federal law by targeting the federal 340B Program and seeking to change the terms of that program. It is foundational constitutional law that States may not regulate Congress's creations. *See McCulloch v. Maryland*, 17 U.S. 316, 359 (1819). H.B. 266 is especially problematic in this sense because the 340B Program entails a contractual relationship (PPAs) between the United States and manufacturers. *See also Barnes v. Gorman*, 536 U.S. 181, 186 (2002) ("Spending Clause legislation [is] much in the nature of a contract…."). The terms of that contract—AbbVie's access to Medicaid and Medicare Part B in exchange for congressionally identified hospitals receiving discounted drugs—are laid out in the 340B statute. 42 U.S.C. § 256b. Therefore, even if federal law is silent about manufacturers' contract-pharmacy policies, as many states contend, that just means that Congress decided ***not*** to include restrictions like the ones found in H.B. 266 as a part of the bargain. Congressional silence is not an invitation for Vermont to tack on new terms to the United States' contract with AbbVie or single out those

with federal contract relationships for special state-law disabilities. *See United States v. Washington*, 596 U.S. 832, 839-41 (2022); *Boyle v. United Techs. Corp.*, 487 U.S. 500, 504-13 (1988).

137.    H.B. 266 undeniably imposes new state-law obligations that have the purpose and effect of expanding the 340B Program.  Vermont prevents manufacturers from conditioning their 340B offers, so more confiscatory priced sales will take place solely because of Vermont's law. And H.B. 266 broadens the class of entities entitled to receive 340B-discounted prices and attempts to force manufacturers to transfer their drugs to third parties—specifically, commercial pharmacies—who are not covered entities.  Vermont's law thus directly conflicts with the federal 340B statute, which leaves manufacturers free to impose reasonable conditions on their 340B offers and authorizes discounts only to covered entities. *See Drummond*, 2025 WL 3048929, at *6 (holding that a comparable statute was preempted because it "effectively expands the definition of 'covered entity' to include contract pharmacies, … 'contrary to federal law'"); *Brown*, 2:25-cv-00271, at *20-21 (finding AbbVie stated a plausible preemption claim against an analogous state law because the law "meaningfully expands the scope of entities entitled to 340B discounts"). Indeed, Congress specifically defined which entities qualify for 340B discounts and intentionally chose not to mandate manufacturer participation in contract-pharmacy arrangements.  *See AstraZeneca*, 543 F. Supp. 3d at 60.

138.    H.B. 266 creates other conflicts, too.  For example, Vermont's law bars a manufacturer from demanding "claims, utilization, encounter, purchase, or other data" from covered entities.  Vt. Stat. Ann. tit. 18, § 4682(b).  But the federal 340B Program contemplates that manufacturers can request such data:  Before accessing the federal ADR system (the exclusive means for enforcing 340B violations), manufacturers must first "conduct an audit."  42 U.S.C.

§ 256b(d)(3)(B)(iv). And before conducting an audit, the manufacturer must have "reasonable cause" to suspect a violation—which requires access to claims data. *See* 61 Fed. Reg. 65,406, 65,409-10 (Dec. 12, 1996) (allowing audits only when the manufacturer already "has documentation," including "sufficient facts and evidence," indicating that there is "reasonable cause" to believe the covered entity violated Section 340B). By preventing manufacturers like AbbVie from requiring claims data or otherwise seeking clarity from covered entities, Vermont effectively forecloses manufacturers' only avenue to pursue audits or claims against covered entities for violations of the 340B Program's requirements. On this basis, two district courts found that analogous claims data provisions in West Virginia and Oklahoma directly conflicted with federal law and were preempted. *See Morrisey*, 760 F. Supp. 3d at 451-53; *Drummond*, 2025 WL 3048929, at *7.

139. H.B. 266 further conflicts with federal law by prohibiting manufacturers from "offer[ing] or otherwise mak[ing] available 340B drug pricing in the form of a rebate." Vt. Stat. Ann. tit. 18, § 4682(d). The federal 340B statute instructs that manufacturers may make the 340B price available to covered entities by either "rebate or discount." 42 U.S.C. § 256b(a)(1).

140. Vermont's law also conflicts with the federal 340B Program by installing a parallel enforcement regime. The Commissioner reports violations of H.B. 266 to a State's Attorney or the Attorney General, who upon receiving a report "shall cause proceedings to be commenced and prosecution in the proper court without delay." Vt. Stat. Ann. tit. 18, § 8; *see also* Vt. Stat. Ann. tit. 3, § 152. Further, H.B. 266 empowers covered entities, contract pharmacies, and any "other person injured by a manufacturer's or its agent's violation of" H.B. 266 to bring a civil suit seeking "injunctive relief, compensatory and punitive damages, costs and reasonable attorney's fees, and other appropriate relief." Vt. Stat. Ann. tit. 18, § 4684(a). But "Congress vested authority to

oversee compliance with the 340B Program in HHS and assigned no auxiliary enforcement role to covered entities" or states. *See Astra*, 563 U.S. at 117. "The absence of a private right to enforce the statutory ceiling-price obligations would be rendered meaningless if 340B entities could overcome that obstacle by suing to enforce the [HHS-manufacturer] contract's ceiling-price obligations instead." *Id.* at 118. Pursuant to that authority, HHS specifically created ADR review for claims related to 340B "overcharges." 42 C.F.R. § 10.21(a)(1). Notably, both HHS and covered entities agree that this ADR review encompasses claims that a manufacturer limited covered entities' acquisition of 340B drugs, including by limiting the use of contract pharmacies. *See, e.g.*, Am. Hosp. Ass'n, Comment on 340B Drug Pricing Program; Administrative Dispute Resolution ("ADR Rule"), HRSA-2022-0001-0030 (HRSA Jan. 27, 2023), at 2, https://tinyurl.com/4znmhz86. Vermont's H.B. 266—by creating a new forum for enforcing the 340B Program and giving private parties the ability to sue manufacturers—is thus an even more brazen attempt to end-run Congress's choice not to include private or state enforcement of 340B than was at issue in *Astra*.

141. Congress not only defined who was entitled to administer the 340B Program (the Secretary of HHS, who has lawfully delegated the authority to HRSA), but it also delineated which tools were available to the Secretary to ensure compliance. The 340B statute defines which audit procedures and ADR mechanisms are available under the 340B Program for handling disputes among manufacturers and covered entities concerning 340B Program compliance. *See* 42 U.S.C. §§ 256b(d)(1)-(3). The 340B statute also spelled out the types of claims it expected to be resolved through ADR— "claims by covered entities that they have been overcharged for" 340B drugs. *Id.* § 256b(d)(3)(A); *see also* 42 U.S.C. § 10.21(a)(1) (authorizing ADR "[c]laims by a covered entity that it has been overcharged by a manufacturer for a covered outpatient drug,

including claims that a manufacturer has limited the covered entity's ability to purchase covered outpatient drugs at or below the 340B ceiling price"). These are the very disputes that Vermont's enforcement regime covers. *See* Vt. Stat. Ann. tit. 18, § 4684(a). Likewise, Congress outlined the penalties that apply to manufacturers who violate the statutory requirements under the 340B Program and engage in "overcharging." *See* 42 U.S.C. §§ 256b(d)(1)-(3). Vermont's attempt to install an alternative compliance and enforcement regime is preempted because it conflicts with the procedures detailed in the 340B statute and any lawfully promulgated federal rules implementing the statute. *Wis. Dep't of Indus., Labor & Hum. Relations v. Gould*, 475 U.S. 282, 291 (1986) (finding a state law pursuing a federal goal preempted because "it assumes for the State of Wisconsin a role Congress reserved exclusively for the Board").

142.    Another type of implied preemption is field preemption, which occurs where "Congress has legislated comprehensively to occupy an entire field of regulation, leaving no room for the States to supplement federal law." *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 163 (2016) (quoting *Nw. Cent. Pipeline Corp. v. State Corp. Commc'n of Kan.*, 489 U.S. 493, 509 (1989)). Field preemption occurs where Congress intends "to foreclose any state regulation in the area, even if it is parallel to federal standards." *Arizona v. United States*, 567 U.S. 387, 401 (2012).

143.    Every element of the federal 340B Program—from eligibility and pricing to compliance and enforcement—is governed by federal law. "Price regulation is exclusively controlled by the federal statute, and state enforcement of it would necessarily intrude on the federal scheme." *Morrisey*, 760 F. Supp. 3d at 458 (internal citation omitted); *see also Drummond*, 2025 WL 3048929, at *5-6 (finding Oklahoma's contract-pharmacy law preempted because it regulates "the *price* at which [] drugs must be sold").

144.    H.B. 266 directly intrudes on the federal 340B scheme.  Vermont's law bars manufacturers from "deny[ing], restrict[ing], prohibit[ing], or otherwise interfer[ing] with, directly or indirectly, the acquisition of a 340B drug by or delivery of a 340B drug to a 340B contract pharmacy on behalf of a 340B covered entity."  Vt. Stat. Ann. tit. 18, § 4682(a).  And the term "340B drug" is defined by reference to the 340B ceiling price established by federal law.  *Id.* § 4681(3).  Thus, the Vermont law prohibits manufacturers from conditioning their 340B offers by declining to transfer their drugs to contract pharmacies ***at a particular price***.  *See Morrisey*, 760 F. Supp. 3d at 455-56; *Drummond*, 2025 WL 3048929, at *5-6.  Manufacturers violate laws like H.B. 266 "not by withholding drugs from contract pharmacies, but by refusing the 340B discount when delivering [their] drugs to those pharmacies."  *Morrisey*, 760 F. Supp. 3d at 455-56; *see also Drummond*, 2025 WL 3048929, at *5-6 (same).  That H.B. 266 defines the drugs at issue as "340B drug[s]" confirms that the statute is a price regulation:  "***Price*** is what distinguishes between an 'ordinary drug' and a 340B Program drug—a fact that seems to be reflected in the [Vermont] statute itself."  *Morrisey*, 760 F. Supp. 3d at 455-56 (emphasis added); *see also Drummond*, 2025 WL 3048929, at *6 ("[W]hen H.B. 2048 defines a '340B drug' as a 'drug that has been subject to any offer for reduced prices by a manufacturer pursuant to [42 U.S.C. § 256b] and is purchased by a covered entity as defined in [42 U.S.C. § 256b(a)(4)]' it does so in recognition of the fact that the only difference between a '340B drug' and a non-340B drug is ... [its] price." (second and third alterations in original) (footnote omitted)).

145.    Indeed, H.B. 266 ***expressly*** regulates 340B drug pricing.  The law defines "340B drug" to mean "a drug that has been subject to any offer for ***reduced prices*** by a manufacturer pursuant to [the 340B Program] and is purchased by a 340B covered entity."  Vt. Stat. Ann. tit. 18,

§ 4681(3) (emphasis added).  And the definition of "340B covered entity" is likewise tethered to "the federal 340B ***drug pricing*** program."  *Id.* § 4681(2).

146.    H.B. 266 was enacted in response to manufacturers' policies, which (according to HRSA and HHS) result in overcharges.  But the federal statute does not authorize state regulation concerning 340B pricing and who is entitled to access manufacturers' drugs at discounted 340B prices.  It leaves no room for states to interfere with the carefully designed, federally created 340B Program.  *See Arizona*, 567 U.S. at 401 (holding that where Congress has occupied the field, state laws that impose additional obligations are preempted).

147.    The federal 340B statute carefully prescribes who may access 340B discounts, when, and under what conditions—including compliance with federal anti-diversion and duplicate discount requirements.  The federal statute governs how prices and discounts are calculated and what obligations manufacturers must follow, requiring them to offer 340B pricing ***only*** to covered entities—not third parties.  *See* 42 U.S.C. § 256b(a)(1).  There can be no question that the 340B Program is a federal creation through and through.

148.    The growing patchwork of divergent state laws exacerbates the constitutional and compliance problems.  The difficulty of complying with varying state regulatory frameworks only increases as more states pass new and different laws relating to the 340B Program.  As of filing, 19 other states have passed contract-pharmacy laws akin to H.B. 266.  State laws such as those passed by Arkansas, Colorado, Hawaii, Louisiana, Maine, Maryland, Minnesota, Mississippi, Missouri, Nebraska, New Mexico, North Dakota, Oklahoma, Oregon, Rhode Island, South Dakota, Tennessee, Utah, and West Virginia, have material differences among and between themselves, complicating compliance by manufacturers and subjecting manufacturers to different and varying enforcement.  Compare, for example, W. Va. Code § 60A-8-6a (extending prohibitions to an

"agent, or affiliate" of a manufacturer); La. Rev. Stat. § 40:2883 (prohibiting a manufacturer from "prevent[ing] or interfer[ing] with ***any patient's choice*** to receive such drugs from the 340B entity" (emphasis added)); N.M. H.B. 78, § 1(A)(4), 57th Leg., 1st Sess. (2025) (covering only entities "receiv[ing] federal grant funding"); and Neb. L.B. 168, § 3(1), 109th  Leg., 1st  Sess. (2025) (compelling delivery to "***any location***" authorized by a covered entity (emphasis added)). Some states, like Tennessee, prohibit requiring the submission of claims data while others do not. *Compare* Md. Health Occupations Code § 12-6C-09.1 (prohibiting restrictions on "delivery" or "acquisition" of "340B drugs"), *with* Tenn. S.B. 1414, § 47-18-136(a)(1), 114th Gen. Assembly (2025) (restricting the collection of "any health information, claims or utilization data, purchasing data, payment data, or other data").  Some states, like Utah, impose criminal penalties for failure to comply while others do not.  *Compare* Mo. Rev. Stat. §§ 407.095, 407.100, 407.110 (allowing for civil penalties), *with* Utah Code Ann. § 31A-2-308(9) (making violations of the statute a Class B misdemeanor).

149.    As these laws continue to accrete, administration of the 340B Program and compliance with a patchwork of state laws may become untenable, with potential catastrophic effects for the nationwide prescription drug industry and for Medicaid and Medicare beneficiaries. *See* Adam J. Fein, *EXCLUSIVE: The 340B Program Soared to $38 Billion in 2020—Up 27% vs. 2019*, Drug Channels (June 16, 2021), https://tinyurl.com/4jdjhh7u (analyzing HRSA data to find the 340B Program accounted for "16% of … total U.S. gross sales of brand-name drugs at list prices" in 2020); *Drummond*, 2025 WL 3048929, at *6 n.65 (referencing a drug manufacturer's decision to withdraw from federal health programs because of the 340B Program's rising costs).

150.    Importantly, the injury here flows ***not*** from the federal 340B Program itself, but from Vermont's attempt to override and distort it.  H.B. 266 does not merely interact with the 340B

statute—it imposes new obligations that conflict with the structure Congress created.  Here, AbbVie does not challenge Congress's design or dispute the requirements imposed under federal law.  Rather, it challenges Vermont's effort to rewrite those requirements by transforming a conditional federal offer into a mandatory, state-enforced sale on terms the federal statute does not require (and which may in fact even *violate* the federal statute), and by effectively foreclosing AbbVie's ability to access the federal enforcement scheme.  Vermont's law does not fill a gap:  It tears through the fabric of the federal scheme Congress designed to be uniform, voluntary, and within the exclusive federal enforcement authority of HHS.

### SECOND CLAIM FOR RELIEF

### *Declaratory/Injunctive Relief – Federal Preemption By HRSA's Rebate Model Pilot Program: Supremacy Clause, U.S. Const. art. VI, cl. 2*

151.    AbbVie re-alleges and incorporates by reference all of the allegations contained in the preceding paragraphs of this complaint as though set forth fully herein.

152.    Vermont's law is not merely preempted by the 340B Program.  H.B. 266 is also independently preempted by HRSA's Rebate Program.

153.    Conflict preemption occurs where it is impossible for a private party to comply with both state and federal law or where "the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Crosby*, 530 U.S. at 372-73.

154.    AbbVie was accepted to participate in HRSA's Rebate Program, which begins on January 1, 2026.  HRSA, 340B Rebate Model Pilot Program, https://tinyurl.com/yzd3dvep.

155.    The Rebate Program requires "[c]overed entities … to provide [claims] data to participating manufacturers in order for the manufacturers to provide rebates to effectuate the 340B discount on the entities' covered outpatient drug purchases."  90 Fed. Reg. at 44,198.

156.    In fact, HRSA's approval notice expressly lists a series of "data fields … for covered entity submission in order to effectuate the rebate," including, but not limited to, "Date of Service," "Date Prescribed," "Rx number," "Fill number," "Quantity Dispensed," "Prescriber ID," and "340B ID."  HRSA, 340B Rebate Model Pilot Program, https://tinyurl.com/yzd3dvep.

157.    But Vermont's H.B. 266 prohibits manufacturers' collection of claims data.  Vt. Stat. Ann. tit. 18, § 4682(b)

158.    H.B. 266 thus interferes with AbbVie's ability to participate in the Rebate Program because the Rebate Program authorizes AbbVie to request and obtain the very same claims data that H.B. 266 prevents AbbVie from requesting and obtaining.

159.    Additionally, under the Rebate Program, AbbVie will provide post-dispense rebates to covered entities rather than making the initial sale to covered entities at the 340B price. 90 Fed. Reg. at 36,163; *see also* 42 U.S.C. § 256b(a)(1) (permitting manufacturers to make the 340B price available either through an upfront "discount" or an after-the-fact "rebate").

160.    H.B. 266, however, prohibits manufacturers from "offer[ing] or otherwise mak[ing] available 340B drug pricing in the form of a rebate."  Vt. Stat. Ann. tit. 18, § 4682(d).  It instead requires manufacturers to "make available 340B drug pricing … in the form of a discount at the time of purchase."  *Id.*

161.    H.B. 266 therefore inhibits AbbVie's ability to participate in the Rebate Program because the Rebate Program (and federal law) authorizes AbbVie to provide 340B pricing through a rebate, something H.B. 266 explicitly forbids.

## THIRD CLAIM FOR RELIEF

### *Prospective Injunctive Relief and Declaratory Relief –*
### *Violation of Takings Clause, U.S. Const. amend. V, cl. 4*

162.     AbbVie re-alleges and incorporates by reference all of the allegations contained in the preceding paragraphs of this complaint as though set forth fully herein.

163.     The Takings Clause of the Fifth Amendment provides: "[N]or shall private property be taken for public use, without just compensation."  U.S. Const. amend. V; *see also Chicago, Burlington & Quincy Ry. v. Chicago*, 166 U.S. 226, 234-35 (1897) (incorporating and making applicable to states the Takings Clause of the Fifth Amendment through the Due Process Clause of the Fourteenth Amendment).

164.     The Takings Clause extends to both real and personal property.  *Horne*, 576 U.S. at 358.  It is not limited to instances when the government physically appropriates property for its own use through eminent domain.  A taking can also occur through legislation and regulation that sufficiently deprives a user of its property rights.  *See E. Enters. v. Apfel*, 524 U.S. 498, 529 (1998).

165.     Under the Constitution, the government has no authority to force A-to-B transfers of private property for the benefit of private parties.  *See Kelo*, 545 U.S. at 477 (explaining that "the sovereign may not take the property of *A* for the sole purpose of transferring it to another private party *B*, even though *A* is paid just compensation").  Such private takings are always unconstitutional, since "[n]o amount of compensation can authorize such action."  *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 543 (2005); *see also Calder v. Bull*, 3 U.S. (3 Dall.) 386, 388 (1798) ("It is against all reason and justice" to allow government to "take[] property from A. and give[] it to B.").

166.     "Whenever a regulation results in a physical appropriation of property, a *per se* taking has occurred."  *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 149 (2021).  Statutes or

regulations that mandate the physical transfer of personal property from one private party to another private party amount to an unconstitutional taking with or without just compensation.

167.    Vermont's H.B. 266 appropriates AbbVie's property rights in its drugs for the private benefit of for-profit, commercial pharmacies.  On its face, H.B. 266 prohibits manufacturers from "deny[ing]," "restrict[ing]," "prohibit[ing]," or "otherwise interfer[ing] with" the "acquisition" of drugs at 340B-discounted prices by a "340B contract pharmacy."  Vt. Stat. Ann. tit. 18, § 4682(a).  Vermont thus requires manufacturers to provide their drugs to covered entities and commercial pharmacies at below-market prices by adding a state-law obligation onto the federal 340B scheme.  That is an impermissible *per se* taking under the Constitution's Takings Clause.  *See Drummond*, 2025 WL 3048929, at *8-9 (finding that Oklahoma's contract-pharmacy law "effects an [*per se*] unconstitutional taking" "for purposes of bestowing a private benefit"); *Brown*, No. 2:25-cv-00271, at *21-23 (same).

168.    H.B. 266 mandates that pharmaceutical manufacturers provide drugs at below-market prices, depriving them of control over their own pricing structures and revenue.  It compels sales or transfers of AbbVie's drugs at the 340B-discounted price that, in the absence of H.B. 266, would not occur.  AbbVie's offer is conditioned on the covered entity's acceptance of AbbVie's contract-pharmacy policy.  Without H.B. 266, if a covered entity counteroffered with a term requiring unlimited contract-pharmacy access, AbbVie would simply refuse and no sale at the 340B-discounted price would take place.  However, H.B. 266 compels AbbVie to accept the counteroffer and complete the sale at the discounted price on terms AbbVie would not otherwise have agreed to.

169.    H.B. 266 expands the federal 340B Program requirements in a way that shifts financial burdens onto manufacturers, reducing revenue and eliminating rebate offsets, without

just compensation and with no justified public use. *See Drummond*, 2025 WL 3048929, at *9 (finding an analogous law a *per se* taking because it does not "serve[] a *Kelo*-kosher public purpose" and the "confiscatory" prices it mandates do no constitute just compensation).

170.    Even if there were a public use here, AbbVie would never receive just compensation.  State law provides none, and the Eleventh Amendment prevents AbbVie from seeking monetary relief from Vermont in a 42 U.S.C. § 1983 suit.

171.    In the alternative, H.B. 266 effectuates a regulatory taking.

172.    In *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 124 (1978), the Supreme Court recognized that a regulatory taking requires consideration of a flexible three-factor test: (1) the economic impact of the regulation, (2) the extent to which the regulation has interfered with investment backed expectations, and (3) the "character of the governmental action."

173.    H.B. 266's requirement that manufacturers transfer their drugs to commercial pharmacies effectuates a constitutionally impermissible regulatory taking because it requires the physical acquisition of AbbVie's drugs by another private party for no public purpose or use; imposes significant financial losses on AbbVie and other manufacturers; interferes with drug manufacturers' reasonable investment-backed expectations; and serves no valid government purpose because it deprives manufacturers of the full use and control of their property on a continual basis for the commercial benefit of private parties.

## FOURTH CLAIM FOR RELIEF

### *Declaratory/Injunctive Relief –*
### *Due Process Clause, U.S. Const. amend. XIV*

174.    AbbVie re-alleges and incorporates by reference all of the allegations contained in the preceding paragraphs of this complaint as though set forth fully herein.

175.     The Due Process Clause of the Fourteenth Amendment provides that no state may "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.

176.     A statute offends the Due Process Clause if it is impermissibly vague—*i.e.*, if the law "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "if it authorizes or even encourages arbitrary and discriminatory enforcement."  *Cunney v. Bd. of Tr. of Vill. of Grand View, N.Y.*, 660 F.3d 612, 621 (2d Cir. 2011) (quoting *Hill v. Colorado*, 530 U.S. 703, 732 (2000)).

177.     H.B. 266's text makes it impossible to know what it prohibits and how it might be enforced.

178.     Consider the law's "interference" prohibition:  "A manufacturer or its agent shall not … interfere with, directly or indirectly, the acquisition of a 340B drug by or delivery of a 340B drug to a 340B contract pharmacy …."  Vt. Stat. Ann. tit. 18, § 4682(a).  That prohibition is unconstitutionally vague because it does not provide manufacturers fair notice as to what is proscribed, and it invites arbitrary enforcement.

179.     Vermont's statute provides no guidance on what "interfere" means.  "Interfere" (or "interference") is not defined.  *See id.* § 4681.  Nor is the term—as used in H.B. 266—part of a list that would otherwise provide context clues as to its meaning.  And the statute exacerbates these problems by prohibiting even "indirect[]" "interfere[nce]."  *Id.* § 4682(a).

180.     What is more, the "interference" provisions contain no apparent scienter requirement.  *See id.*  It does not, for example, require interference to be purposeful or intentional.  Therefore, AbbVie could be liable for accidentally "interfering" (whatever that means) with a contract pharmacy.  And that is bound to happen.  Covered entities and contract pharmacies are

fiercely resistant to making their contracts available to manufacturers or the public. That aggravates the already glaring vagueness problem because manufacturers have no idea what terms they might potentially "interfere" with. *E.g.*, *Colautti v. Franklin*, 439 U.S. 379, 395 (1979) ("This Court has long recognized that the constitutionality of a vague statutory standard is closely related to whether that standard incorporates a requirement of *mens rea*.").

181.    H.B. 266 is thus unconstitutionally vague—both on its face and as applied to AbbVie's ability to enforce its contract-pharmacy and claims-data policies. Vermont's law fails to provide sufficient notice as to what conduct is prohibited, particularly in the complex and data-dependent context of 340B transactions. And it invites arbitrary enforcement. People of normal intelligence must guess at H.B. 266's meaning and may well offer vastly different yet reasonable interpretations of its scope.

## PRAYER FOR RELIEF

**WHEREFORE,** AbbVie prays for the following relief:

1.    A declaration, order, and judgment holding H.B. 266 unlawful because it is preempted by federal law and unconstitutional under the Supremacy Clause;

2.    A declaration, order, and judgment declaring that H.B. 266 effects an impermissible taking of AbbVie's property;

3.    A declaration, order, and judgment declaring that H.B. 266 is unconstitutionally vague in violation of the Due Process Clause;

4.    A declaration, order, and judgment holding that the federal 340B statute does not require drug manufacturers to unconditionally provide 340B pricing to covered entities or contract pharmacies, or to transfer or cause their discounted covered outpatient drugs to be transferred to contract pharmacies;

5.   A declaration, order, and judgment holding that the federal 340B statute empowers drug manufactures to require covered entities to provide claims data in exchange for 340B pricing;

6.   A preliminary and permanent injunction enjoining Defendant from reporting an alleged violation of H.B. 266 by AbbVie or any person or entity acting as an agent of AbbVie to any State's Attorney in Vermont or the Attorney General of Vermont;

7.   A preliminary and permanent injunction enjoining Defendant from enforcing H.B. 266 against AbbVie;

8.   An award of all costs and attorneys' fees pursuant to any applicable statute or authority; and

9.   Any other relief that this Court deems just and proper.

Dated: November 25, 2025                    Respectfully submitted,


By: /s/ *Tristram Coffin*
Tristram Coffin
DOWNS RACHLIN MARTIN, PLLC
199 Main Street
P.O. Box 190
Burlington, VT 05402
Telephone: 802-846-8378
Fax:  802-862-7512
Email:  tcoffin@drm.com

Matthew S. Owen, P.C. (*pro hac vice* forthcoming)
Meredith M. Pohl (*pro hac vice* forthcoming)
Neil Joseph (*pro hac vice* forthcoming)
Nick Bell (*pro hac vice* forthcoming)
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue N.W.
Washington, D.C. 20004
Telephone: (202) 389-5000
Email: matt.owen@kirkland.com
        meredith.pohl@kirkland.com
        neil.joseph@kirkland.com
        nick.bell@kirkland.com

*Counsel for Plaintiffs*